**SKY FUN 1, a Colorado corporation, Petitioner,**

v.

**John SCHUTTLOFFEL, Respondent.**

No. 00SC291.

Supreme Court of Colorado.
En Banc.

July 2, 2001.

Peter Schild, Boulder, CO, Attorney for Petitioner.

Jerre W. Dixon, Denver, CO, Attorney for Respondent.

Justice HOBBS delivered the Opinion of the Court.

We granted certiorari to decide two issues arising from the court of appeals decision in *Sky Fun 1, Inc. v. Schuttloffel*, 8 P.3d 570 (Colo.App.2000): first, whether certain verbal statements made by a pilot's previous employer are protected by the limited liability provision of 49 U.S.C. § 44936(g) (Supp. IV 1999) precluding a defamation suit brought by the pilot against the employer; second, whether the statutory limitation on exemplary damages contained in section 13–21–102(1)(a), 5 C.R.S. (2000), applies equally to verdicts of a jury and the bench trying a case without a jury.[1]

The court of appeals decided that the verbal statements at issue here were not within the federal liability limitation, and thus allowed the pilot's state law defamation suit. The court of appeals allowed the trial court's award of exemplary damages in excess of actual damages, despite the limitation on such damages contained in section 13–21–102(1)(a), because the exemplary damages awarded were "reasonable."

We affirm the court of appeals in part and reverse in part. We hold that the limited liability provision of § 44936(g) does not preempt a defamation suit under state law by a pilot applicant against the former employer, when the defamatory oral statements are not based on records supplied by the previous employer to the prospective employer. We also hold that the limitation on exemplary damages in section 13–21–102(1)(a) applies equally to bench and jury trials.

I.

Petitioner, Sky Fun 1, employed respondent, John Schuttloffel (Schuttloffel), as a corporate pilot. On the afternoon of May 2, 1997, Schuttloffel and Bill Kitchen (Kitchen), Sky Fun 1's chief executive officer, flew from the Raleigh/Durham area of North Carolina to Denver in Sky Fun 1's corporate aircraft. At the time of the flight, both Schuttloffel and Kitchen held airline transport pilot ratings. Kitchen controlled the aircraft as the pilot in command when the plane left the ground in North Carolina, but approximately one-half hour after taking off, he retired to the back of the plane, leaving Schuttloffel in command.

Prior to takeoff, Schuttloffel filed an instrument flight plan with Flight Service and checked the weather report. Although the weather report indicated possible thunderstorm activity in line with the planned flight path, the conditions were not sufficiently severe to merit altering the planned route of flight.

During the flight, and while Schuttloffel was in command, on-board instruments showed two "cells" of weather and associated lightning directly ahead of the plane. After consulting with Air Traffic Control, Schuttloffel elected to divert—gradually at first and then more dramatically—to the north around the two weather cells. After the diversion, approximately two hours into the flight, lightning struck the plane. Although the lightning caused significant damage, neither

---

1. We granted certiorari to decide: (1) "Whether the Court of Appeals erred by determining that unlike pilot records, oral statements about such records are not immune from defamation liability under the Pilot Records Improvement Act, 49 U.S.C. § 44936"; and (2) "Whether the Court of Appeals erred by determining that C.R.S. § 13–21–102(1)(a), which provides a one-to-one limitation of exemplary damages compared to actual damages in jury trials, does not set similar limits in court trials."

Schuttloffel nor Kitchen was injured, and the plane landed safely.

Four days later, Kitchen informed Schuttloffel by written memorandum that the cost of repairing the aircraft would be high, and that Sky Fun 1 no longer required his services. In the memorandum, Kitchen stated that he would be happy to recommend Schuttloffel for employment as a pilot in the future: "For your benefit, I will not discuss this matter outside the company, and will simply tell anyone who asks that we no longer needed a full time pilot. I will be happy to recommend you to help you find new employment."

Thereafter, Schuttloffel sought employment with Mountain Air Express. Pursuant to § 44936(f), Mountain Air Express sought records maintained by Sky Fun 1 pertaining to Schuttloffel's piloting proficiency. Schuttloffel signed a consent and release from liability form, pursuant to § 44936(f)(2), allowing the prospective employer to obtain the records. Kitchen filled out a standard checklist-type form used to convey such records. Next to the questions asking: (1) "Do you have any record entered within the past five years showing that the applicant was removed from flying status for any performance or professional competency reason?"; and (2) "Do you have any record entered within the past five years showing that the applicant was the subject of any disciplinary action that was not subsequently overturned?", Kitchen checked "yes" and wrote "CALL ME!" next to the entry. Both questions requested that the reviewer provide documentation if answering "yes." Kitchen provided no documentation at that time.

Nancy Trapagnier–Hoffman (Trapagnier–Hoffman), the Pilot Training Coordinator with Mountain Air Express, called Kitchen to follow up on the "CALL ME!" notation. Kitchen stated that Schuttloffel was very good in flight simulators, but not a good pilot and Mountain Air Express should not hire him as he was a threat to passenger safety. Trapagnier–Hoffman requested written records supporting these statements, but Kitchen stated that Sky Fun 1 did not keep any such records. During the trial, Trapagnier–Hoffman said that she had never seen such a

"CALL ME!" notation on the written reply to the standard records request and did not know of any company that employed pilots but did not keep pilot records.

Thereafter, Kitchen initiated calls to Trapagnier–Hoffman on several occasions, at least four or five times. During those calls, Kitchen inquired whether Mountain Air Express was going to hire Schuttloffel, and if so, why he was going to be hired. He also asked why Schuttloffel was still a part of Mountain Air Express's pilot training program, and told Trapagnier–Hoffman that Mountain Air Express should not hire Schuttloffel. The calls Kitchen made did not provide useful information and became annoyances, to the point that Trapagnier–Hoffman would simply put Kitchen on hold in order to avoid him.

Eventually, Kitchen faxed to Trapagnier–Hoffman a document labeled "Termination Report." It detailed three incidents where Schuttloffel allegedly acted dangerously in his capacity as a pilot. The three incidents included the lighting strike occurrence, a pre-flight inspection incident involving a missing cotter pin in the nose wheel of a plane, and an irregular flight plan on departure from Aspen Airport. Kitchen did not supplement the "Termination Report" with the pilot's logbooks or any other supporting information, contrary to the typical practice in the industry. During the trial, Schuttloffel indicated that while he was employed by Sky Fun 1, Kitchen never supplied him with the "Termination Report," nor had Kitchen ever questioned his piloting skills.

After consulting Mountain Air Express's chief pilot and interviewing Schuttloffel about the "Termination Report," Trapagnier–Hoffman elected to afford little weight to that document. Trapagnier–Hoffman believed that Kitchen likely fabricated the document to affect Mountain Air Express's hiring decision and not in the course of business, as Kitchen had previously stated that Sky Fun 1 did not keep pilot records and this report was not supplied in connection with the reply to the standard pilot records request form. Mountain Air Express hired Schuttloffel as a pilot, despite Kitchen's efforts to frustrate Schuttloffel's employment opportunities.

On August 15, 1997, Sky Fun 1 filed suit against Schuttloffel in the Adams County District Court, asserting negligence and seeking damages of $60,000 for costs to repair the plane and for other financial losses associated with the lightning strike incident, including diminution in value of the aircraft, loss of use, and the interest related thereto. Schuttloffel denied negligence, and he counterclaimed for withheld wages and vacation pay, tortious interference with a prospective contract or business advantage, and defamation. After a trial to the bench, the court found for Schuttloffel on the negligence, wages and vacation pay, and defamation claims, and against him on the remaining issues. In addition to the withheld wages and vacation pay, the trial court awarded Schuttloffel $1.00 in actual damages for the defamation claim, as Mountain Air Express had hired Schuttloffel despite Kitchen's verbal warnings, and $5,000.00 in exemplary damages.

The court of appeals affirmed the trial court's decision, concluding that the written consent and limited liability provisions of 49 U.S.C. § 44936 concerned only the records specifically enumerated thereunder and not the telephone calls Kitchen made to Mountain Air Express. The court of appeals further decided that the trial court properly awarded exemplary damages in an amount exceeding the actual damages, despite the language of section 13–21–102(1)(a)—limiting exemplary damages to no greater than the amount of actual damages—because the award was reasonable, and the trial court did not abuse its discretion. We affirm in part and reverse in part.

## II.

We hold that the limited liability provision of § 44936(g) does not preempt a defamation suit under state law by a pilot applicant against his former employer, when the defamatory verbal statements are not based on records supplied by the previous employer pursuant to § 44936(f)(1). We also hold that the limitation on exemplary damages in section 13–21–102(1)(a) applies equally to both bench and jury trials.

### A.

#### Airline Pilot Hiring and Safety Act

In 1996, the United States Congress passed the Airline Pilot Hiring and Safety Act (the Act). It requires that air carriers request and receive certain records before an individual begins service as a pilot with the new employer. § 44936(f)(1). The Act's committee report expressed general satisfaction with the overall quality of pilots in the country and the isolated background checks that air carriers and other pilot employers performed. H.R.Rep. No. 104–684, at 6 (1996). However, the committee report expressed concern over the lack of coordination among air carriers and pilot employers regarding sharing pilot certifications and proficiency records. *Id.* The report stated that four fatal accidents in the previous ten years involving pilots with questionable safety records served as the impetus for the Act. *Id.* The report concluded that sharing pilot records was the best method to ensure that pilots would not avoid inquiry into their possibly questionable safety backgrounds when seeking subsequent employment. *Id.*

In pertinent part, the records required by the Act include the following:

(1) In general. Subject to paragraph (14), before allowing an individual to begin service as a pilot, an air carrier shall request and receive the following information:

\* \* \*

(B) Air carrier and other records. From any air carriers or other person (except a branch of the United States Armed Forces, the National Guard, or a reserve component of the United States Armed Forces) that has employed the individual as a pilot of a civil or public aircraft at any time during the 5 year period preceding the date of the employment application of the individual, or from the trustee in bankruptcy for such air carrier or person—

\* \* \*

(ii) other records pertaining to the individual's performance as a pilot that are

maintained by the air carrier or person concerning—

(I) the training, qualifications, proficiency, or professional competence of the individual, including comments and evaluations made by a check airman designated in accordance with section 121.411, 125.295, or 135.337 of such title;

(II) any disciplinary action taken with respect to the individual that was not subsequently overturned; and

(III) any release from employment or resignation, termination, or disqualification with respect to employment.

§ 44936(f)(1).

The Act addressed the air carriers' concern for potential lawsuits stemming from violations of a pilot's right to privacy, *see* H.R.Rep. No. 104–684, at 6, in two ways. First, § 44936(f)(2) required that air carriers seeking records obtain a written consent and release from liability from a pilot applicant. Second, § 44936(g) limited a record provider's liability from suits brought by a pilot applicant.

The Act's written consent provision states:

(2) Written consent; release from liability. An air carrier making a request for records under paragraph (1)—

(A) shall be required to obtain written consent to the release of those records from the individual that is the subject of the records requested; and

(B) may, notwithstanding any other provision of law or agreement to the contrary, require the individual who is the subject of the records to request to execute a release from liability for any claim arising from the furnishing of such records to or the use of such records by such air carrier (other than a claim arising from furnishing information known to be false and maintained in violation of a criminal statute).

§ 44936(f)(2).

The Act's liability limitation states:

(1) Limitation on liability. No action or proceeding may be brought by or on behalf of an individual who has applied for or is seeking a position with an air carrier as a pilot and who has signed a release from liability, as provided for under paragraph (2), against—

(A) the air carrier requesting the records of that individual under subsection (f)(1);

(B) a person who has complied with such request;

(C) a person who has entered information contained in the individual's records; or

(D) an agent or employee of a person described in subparagraph (A) or (B); in the nature of an action for defamation, invasion of privacy, negligence, interference with contract, or otherwise, or under any Federal or State law with respect to the furnishing or use of such records in accordance with subsection (f).

(2) Preemption. No State or political subdivision thereof may enact, prescribe, issue, continue in effect, or enforce any law (including any regulation, standard, or other provision having the force and effect of law) that prohibits, penalizes, or imposes liability for furnishing or using records in accordance with subsection (f).

(3) Provision for knowingly false information. Paragraphs (1) and (2) shall not apply with respect to a person who furnishes information in response to a request made under subsection (f)(1), that—

(A) the person knows is false; and

(B) was maintained in violation of a criminal statute of the United States.

§ 44936(g)(1).

Sky Fun 1 asserts that the written consent and limitation of liability provisions in §§ 44936(f)(2) and (g), respectively, prevent Schuttloffel's state law defamation action, as it arose out of supplying records pursuant to the Act.

■ We are not aware of any cases interpreting either the nature or scope of § 44936(f)(1)'s record requirement, § 44936(f)(2)'s written consent and release from liability provisions, or § 44936(g)'s lia-

bility limitation provision.[2] We must therefore construe these provisions as a matter of first impression. We determine and effectuate the legislature's intent by looking first to the ordinary and common meaning of the statute's words. *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438, 119 S.Ct. 755, 760, 142 L.Ed.2d 881, 891–92 (1999); *Reves v. Ernst & Young,* 507 U.S. 170, 177, 113 S.Ct. 1163, 1169, 122 L.Ed.2d 525, 535 (1993); *see also City & County of Denver v. Board of Assessment Appeals,* 30 P.3d 177, 180 (Colo. 2001), *as modified.*

Section 44936(f)(1) mandates that an air carrier request and receive certain specified information regarding the pilot applicant. The Act identifies that information as "records" from air carriers and other individuals that have employed the pilot candidate in the previous five years. The records enumerated in the Act include those pertaining to the individual's performance as a pilot that are maintained by the employer concerning training, qualifications, proficiency, professional competence, results of disciplinary actions not subsequently overturned, and any release from employment, resignation, termination, or disqualification.

The Act does not define the term "record," nor does it address verbal statements regarding the records. Generally, a record is "[a] piece of writing that recounts or attests to something [or] an official contemporaneous document recording the acts of some public body or officer." *Webster's Third New International Dictionary: Unabridged* 1898 (1993). *Black's Law Dictionary* 1279 (7th ed.1999) defines "record" as "[a] documentary account of past events ... designed to memorialize those events; information that is inscribed on a tangible medium or that, having been stored in an electronic medium, is retrievable in perceivable form." A document is "[s]omething tangible on which words, symbols, or marks are recorded." *Id.* at 498. Thus, the common meaning of "record" refers to a contemporaneous event memorialized on a tangible medium.

The purpose of the Act is to promote air safety through the hiring of qualified pilots. H.R.Rep. No. 104–684, at 6. The Act accomplishes its goal by ensuring the free exchange of pilot's records among pilot employers. *Id.* The committee report specifically summarized the purpose of the limited liability provision and the exception thereto as follows:

> An exception to [the limitation on liability] provision would apply where the air carrier knowingly provided false information with respect to a pilot's record. This exception is narrowly drawn to allow lawsuits only where the airline actually lies about the pilot.... This should protect the airlines from frivolous lawsuits while preventing an airline from ruining a good pilot's career because of some manager's personal vendetta.

*Id.* at 7.

■ State courts must respect principles of federal preemption when applicable to the case under consideration. *Arapahoe County Pub. Airport Auth. v. Centennial Express Airlines, Inc.,* 956 P.2d 587, 593–94 (Colo. 1998); *Greenwood Trust Co. v. Conley,* 938 P.2d 1141, 1147–48 (Colo.1997). In *Greenwood Trust,* 938 P.2d at 1149, we gave effect to a federal act that provided a limitation on state defamation actions, but also contained an exception for false information supplied with malice or willful intent to injure.

■ Congress may preempt state defamation law in some respects but allow it to operate in other respects. While Congress has generally preempted the field of airline safety, it has allowed state tort remedies to stand in other instances. *See Abdullah v. American Airlines,* 181 F.3d 363, 368–69 (3d Cir.1999). "The intricate web of statutory provisions affords no room for the imposition of state law criteria vis-a-vis pilot suitability. We therefore conclude, without serious question, that preemption is implied by the comprehensive legal scheme which imposes on the [FAA Administrator] the duty of qualifying pilots for air service." *Id.* at 370. Nev-

**2.** *Johnson v. Baylor University,* 214 F.3d 630 (5th Cir.2000), is the only case to consider the Act. The question presented in *Johnson* was whether the Act completely preempted state law for the purposes of federal question jurisdiction. *Id.* at 630.

ertheless, "[e]ven though we have found federal preemption of the standards of aviation safety, we still conclude that the traditional state and territorial law remedies continue to exist for violations of those standards. Federal preemption of the standards of care can coexist with state and territorial tort remedies." *Id.* at 375.

■ The exercise of federal supremacy must be respected but is not lightly presumed. *City of Grand Junction v. Ute Water Conservancy Dist.*, 900 P.2d 81, 87–88 (Colo.1995). Under the common law, including that of Colorado, the cause of action for the tort of defamation exists to protect against unwarranted verbal or written assaults on a person's personal and/or professional reputation. *Keohane v. Stewart*, 882 P.2d 1293, 1297–98 (Colo.1994). So that protected opinion is differentiated from false and defamatory factual assertions, courts examine the factual connotation of the alleged defamatory statement, in determining whether it is actionable. *In re Green*, 11 P.3d 1078, 1083–84 (Colo.2000); *NBC Subsidiary (KCNC–TV), Inc. v. The Living Will Ctr.*, 879 P.2d 6, 11 (Colo.1994).

■ Applying these principles of statutory construction, the common law of torts, federal preemption, and federalism in the case before us, we hold that the limited liability provision of the Act prevents suits based on the pilot records provided to a potential employer, including the personnel records, and oral statements made in connection with explaining the circumstances and contents of such records. This interpretation carries out the Act's purpose of protecting public safety in matters of air commerce. On the other hand, the wording of the Act and its committee report plainly demonstrate that Congress was also solicitous of a pilot's reputation and employment opportunities. Protecting the public safety depends on the availability of qualified pilots. Accordingly, Congress determined that pilot hiring decisions should be based on facts regarding the pilot's training, skill, performance, and safety record. The pilot applicant must sign a release of the records for the prospective employer and must anticipate that some verbal interchange will occur between past and prospective employers concerning the applicant and the records provided.

■ However, Congress did not broadly immunize oral statements; rather, it chose to utilize the term "record" as the operative though undefined term in the limitation of liability provision. We conclude that the preemptive terms of the Act do not affect Colorado common law defamation actions involving verbal assertions that the speaker knew to be false or the speaker made in reckless disregard of the truth, when the verbal statements are not based upon previous employer's records. Such is the case before us, which involves verbal statements calculated to ruin Schuttloffel's professional reputation and prevent his employment as a pilot.

## B.

### Kitchen's Defamatory Statements

■ The trial court found that the statements made by Kitchen on the telephone to Trapagnier–Hoffman were not protected by the Act. Regarding the telephone statements, the trial court's oral findings were that the calls

> were not made to protect the safety of the public; the calls were not made to protect the integrity of Mountain Air Express; the calls were not made because of any concern about Mr. Schuttloffel's flying skills; the calls were made in an attempt to preclude the hiring of Mr. Schuttloffel by Mountain Air Express.

Evidence in the record showed that Kitchen made numerous calls to Trapagnier–Hoffman, but did not provide the kind of documentation required by the Act or Mountain Air Express. Kitchen repeatedly called Trapagnier–Hoffman to state, without substantiation, that Mountain Air Express should not hire Schuttloffel, and that he was a threat to passenger safety. Trapagnier–Hoffman testified in part as follows:

> Q: Okay. Did Mr. Kitchen say anything about Mr. Schuttloffel being in class or being employed by the airline that caused you concern?

A: What caused me concern was more of he would say that we shouldn't have him as a pilot.

Q: Why—did he say why?

A: He said he wasn't a good pilot. He said he was great in the simulator but he was not a good pilot. And I've never had an airliner say something like that. And he didn't have anything.

I kept reminding Mr. Kitchen I had to have something in writing, that I could not accept verbal, everything has to be in writing with us because I have no proof.

Q: In terms—did he mention anything with regard to the safety of Mr. Schuttloffel or any threats of passengers if he were hired?

A: He said that we shouldn't hire him, that he would be a threat to passengers.

Q: Did he say that on more than one occasion?

A: Yes.

Q: These were all telephone—telephonic communications?

A: Everything was on the telephone.

■■■ The trial court found that Schuttloffel's defamation action could stand.[3] In finding that Kitchen's verbal statements did not fall within the protection of the Act, the trial court essentially decided that the statements contained knowingly false information stemming from a personal vendetta Kitchen had for Schuttloffel concerning personal issues between them.[4] The court's oral find-

ings include a finding that the statements Kitchen made to Trapagnier–Hoffman were made with malice and without regard to Schuttloffel's piloting skills. The court's written findings and judgment on the issue of defamation stated in part:

> On the defendant's claim for slander, the Court finds that the written document, [the termination report], contains materials that fall within the parameters of the Pilot Records Improvement Act, 49 U.S.C. § 44936, but that the oral statements made by plaintiff's President and shareholder William Kitchen do not fall within the purview of the Pilot Records Improvement Act. The Court finds that the intent of the calls made by William Kitchen to Nancy Trapagnier–Hoffman at Mountain Air Express were made not to protect public safety in air commerce, but in an attempt to preclude the hiring of Mr. Schuttloffel by Mountain Air Express or to terminate that relationship.

The evidence supports the trial court's findings and conclusions, and we will not disturb them on appeal. *See Haystack Ranch, LLC v. Fazzio*, 997 P.2d 548, 553 (Colo.2000).

We hold that the limited liability provisions of § 44936(g) do not preempt a state common law defamation claim, when the challenged verbal statements contain knowingly false information or are made in reckless disregard of the truth and are not based on records the previous employer maintained and is required to transmit to prospective pilot employers.[5]

---

**3.** To establish an action for slander per se, the plaintiff must show: (1) the defendant made an verbal statement; (2) the statement was published to a third party; and (3) the statement defames the plaintiff's trade, business, or profession. *Pittman v. Larson Distrib. Co.*, 724 P.2d 1379, 1387 (Colo.App.1986). The privilege for "common interest" communication is not absolute, but is lost if actuated by malice. *Id.* at 1388–89; *see also* W. Page Keeton et al., *Prosser and Keeton on The Law of Torts* 828–35 (5th ed.1984). The plaintiff need not use any extrinsic evidence to show that the statement was defamatory in a trade or business practice. *Pittman*, 724 P.2d at 1387. "A statement may be defamatory if it tends so to harm the reputation of another as to lower him [or her] in the estimation of the community or to deter third persons

from associating or dealing with him [or her]." *Burns v. McGraw Hill Broad. Co.*, 659 P.2d 1351, 1357 (Colo.1983).

**4.** Schuttloffel testified that Kitchen called him at home after he had been fired and stated that Schuttloffel had ruined Kitchen's marriage, and that Kitchen was going to destroy Schuttloffel.

**5.** Schuttloffel executed a release from liability, which prevented suit for defamation under federal or state law against Sky Fun 1 and Mountain Air Express in regard to "furnishing or use of such records" in accordance with the Act. The release did not operate here, because the oral statements were not based on the records.

## C.

### Exemplary Damages Restriction

■ The trial court awarded Schuttloffel actual damages of $1.00 and exemplary damages of $5,000.00 on the defamation claim. Sky Fun 1 does not challenge the award of exemplary damages, only the amount of such damages. Sky Fun 1 alleges that pursuant to section 13–21–102(1)(a), the trial court may only award exemplary damages up to the amount of actual damages. Schuttloffel counters that section 13–21–102(1)(a)—by its terms—acts only when the jury and not the court awards actual damages. We do not interpret the statute so restrictively.

Section 13–21–102(1)(a) states:

In all actions in which damages are assessed by a jury for a wrong done to the person or to personal or real property and the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct, the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages. The amount of such reasonable exemplary damages shall not exceed an amount which is equal to the amount of the actual damages awarded to the injured party.

"Exemplary damages in Colorado are available pursuant only to statute." *Corbetta v. Albertson's, Inc.*, 975 P.2d 718, 721 (Colo. 1999). We had occasion to interpret this statute in *Calvat v. Franklin*, 90 Colo. 444, 9 P.2d 1061 (1932); *see also Carlson v. McNeill*, 114 Colo. 78, 85, 162 P.2d 226, 230 (1945). In *Calvat*, like here, trial was held to the court, and the court awarded exemplary damages. We said in *Calvat*, 90 Colo. at 450, 9 P.2d at 1063, that the word "jury" in the statute was not jurisdictional, and held that when a jury was impaneled, the statute simply allowed a jury that awarded actual damages to also award exemplary damages. "There is no language in the section that compels a construction that only a jury may try the issue of exemplary damages." *Id.* Despite the recent revisions of section 13–21–102, the rationale of *Calvat* has continuing validity.

In 1986, the General Assembly amended section 13–21–102, originally enacted in 1889, *see Lira v. Davis*, 832 P.2d 240, 243 (Colo. 1992), by limiting the amount of exemplary damages available to no more than the amount of actual damages awarded. Ch. 106, sec. 1, § 13–21–102(1)(a), 1986 Colo. Sess. Laws 675, 675. "There is no doubt that the purpose of House Bill 1197 [the 1986 amendment] was to limit excessive punitive damages awards." *Lira*, 832 P.2d at 246 (citing *Hearings on H.B. 1197 Before the House State Affairs Comm.*, 55th Gen. Assembly, 2d Sess. (Audio Tape Feb. 4, 1986)). The sponsor of House Bill 1197 stated that the bill was intended to limit the amount of punitive damages to no greater than the amount of actual damages. *Id.* In this manner, the bill meant to punish the wrongdoer by no more than a total award of twice the amount of actual damages. *Id.* There is no logical reason to restrict the purposes of the bill to only jury trials, and no such distinction was made in the 1986 amendment.

■ Our statutory interpretation jurisprudence requires that we reach a reasonable result consistent with the General Assembly's intent, and that we give harmonious effect to all of the statute's parts. *State v. Nieto*, 993 P.2d 493, 501 (Colo.2000). Schuttloffel argues that if the limitation of exemplary damages is applied to actions before the court as well as the jury, it would strip sections 13–21–102(2) and (3) of their meaning, or at least make their application absurd. We disagree.

Sections 13–21–102(2) and (3) state that the court may, under certain circumstances, alter the amount of exemplary damages awarded by the jury. Schuttloffel argues that to permit the court to both set and alter the amount of an exemplary damages award would be absurd. We ascertain no such problem. Sections 13–21–102(2) and (3) simply provide for the trial court's supervisory role over a jury's exemplary damages award. Section 13–21–102(2) permits a trial court to decrease the amount of the exemplary damages award to the extent that: "(a) The deterrent effect of the damages has been accomplished; or (b) The conduct which resulted in the award has ceased; or (c) The

purpose of such damages has otherwise been served." Section 13–21–102(3)(a) permits a trial court to increase the amount exemplary damages awarded to an amount not greater than three times the actual damages, if it is shown that:

> (a) The defendant has continued the behavior or repeated the action which is the subject of the claim against the defendant in a willful and wanton manner, either against the plaintiff or another person or persons, during the pendency of the case; or (b) The defendant has acted in a willful and wanton manner during the pendency of the action in a manner which has further aggravated the damages of the plaintiff when the defendant knew or should have known such action would produce aggravation.

The trial court, unlike a jury, considers the section 13–21–102(2) and (3)(a) factors in the first instance as it determines the proper amount of exemplary damages.[6]

### III.

Accordingly, we affirm the court of appeals' decision that 49 U.S.C. § 44936(g) does not prevent Schuttloffel's defamation action, as the defamatory statements were either knowingly false or made in reckless disregard of the truth and were not based on records the defendant employer was required to transmit to the prospective pilot employer. We reverse the court of appeals' decision, which upheld the trial court's awarding of exemplary damages in the amount of $5,000.00. We hold that section 13–21–102(1)(a)'s restriction on exemplary damages applies equally to bench and jury trials. Accordingly, we affirm the court of appeals' judgment in part and reverse in part. We remand this case to the court of appeals with directions to return it to the trial court for further proceedings consistent with this opinion.

---

**6.** By our decision, we do not mean to say that the trial court may not increase the amount of exemplary damages according to the provisions of section 13–21–102(3)(a).