Vernon G. JOHNSON, Appellant,

v.

BAYLOR UNIVERSITY, Appellee.

No. 10–05–00195–CV.

Court of Appeals of Texas,
Waco.

Feb. 15, 2006.

LaNelle L. McNamara, Waco, for appellant.

Stuart Smith and Roy Barrett, Naman Howell Smith & Lee PC, Waco, for appellee.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

BILL VANCE, Justice.

### Introduction and Background

Vernon Johnson sued Baylor University, asserting four causes of action. Baylor obtained summary judgment; Johnson appeals. We will affirm in part and reverse and remand in part.

Johnson, a pilot working for Baylor from 1992 to 1994, was fired for chronic obesity and poor grammar and diction, which Baylor believed diminished its image to people who flew on Baylor's aircraft. Baylor's president at the time, Dr. Herbert H. Reynolds, however, repeatedly praised Johnson's skills as a pilot. In August 1997 (while his discrimination suit [1] against Baylor was pending), Johnson obtained employment on a probationary basis with Kitty Hawk Air Cargo, Inc., an air freight carrier, and began training. In his pre-employment interview with Kitty Hawk, Johnson informed Kitty Hawk that he had been terminated by Baylor because of his obesity and not because of his performance as a pilot.

Kitty Hawk received a pre-employment background report—prepared by Accu–Screen, Inc. from information obtained from Baylor—that Johnson had been involuntarily terminated for misconduct and that he was ineligible for rehire. Kitty Hawk sought Johnson's employment records from Baylor,[2] but Baylor erroneously responded that Johnson's personnel records were not available. About a month later—and after receiving the report from Accu–Screen and having no records from Baylor—Kitty Hawk dismissed Johnson.[3]

About sixteen months later, after Johnson had obtained copies of the documents that Accu–Screen and Baylor had sent Kitty Hawk, Johnson sued Baylor again, this time alleging tortious interference with a

---

**1.** Johnson unsuccessfully sued Baylor for disability discrimination. *See Johnson v. Baylor Univ.*, 129 F.3d 607 (5th Cir.1997).

**2.** The records were sought under the Pilot Records Sharing Act (PRSA), 49 U.S.C. § 44936(f-h). The operative provisions of this statute were later transferred to 49 U.S.C. § 44703, the Pilot Records Improvement Act (PRIA). These provisions require air carriers to obtain the complete personnel records of pilot applicants who have been employed as a pilot with other air carriers for the preceding five years. *See* 49 U.S.C. § 44703(h-j). Nei-

ther party asserts that the current version of the PRSA's pertinent provisions differ from the provisions in effect in 1997, so we will apply the current version in this appeal.

**3.** Ironically, in the discrimination suit, Dr. Reynolds stated in an affidavit that "Johnson could work as a pilot for an overnight delivery service or for an air freight service ... [or] for other companies which might have different standards for their employees' appearance, dress, grooming and grammar."

contract and with a prospective contractual relationship, and contending that Baylor's statements to Kitty Hawk were false and had caused his employment with Kitty Hawk to be terminated.[4] Johnson later added defamation and negligent misrepresentation claims. Ultimately, the trial court granted summary judgment for Baylor on all of Johnson's claims.

Johnson raises three issues, asserting that the trial court erred in granting summary judgment on his tortious interference, defamation, and negligent misrepresentation claims, respectively.

### Standard of Review

We review the decision to grant a summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex.2003). The standards for reviewing a traditional motion for summary judgment are well established. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985). The movant has the burden of showing that no genuine issue of material fact exists and that it is entitled to the summary judgment as a matter of law. *American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex.1997); *Ash v. Hack Branch Distributing Co.*, 54 S.W.3d 401, 413 (Tex.App.-Waco 2001, pet. denied). The reviewing court must accept all evidence favorable to the nonmovant as true. *Nixon*, 690 S.W.2d at 549; *Ash*, 54 S.W.3d at 413. Every reasonable inference must be indulged in favor of the nonmovant and all doubts resolved in his favor. *American Tobacco*, 951 S.W.2d at 425; *Ash*, 54 S.W.3d at 413. Consistent with the standard of review, we present the background facts in the light most favorable to the nonmovant. *See Turner v. KTRK TV., Inc.*, 38 S.W.3d 103, 109 (Tex.2000); *see also Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 172 (Tex.2003) (appellate court views record in light most favorable to nonmovant when reviewing no-evidence summary judgment motion).

If the movant for summary judgment is a defendant, then the movant must negate at least one of the elements of the nonmovant's cause of action, or alternatively, the movant must conclusively establish each element of an affirmative defense. *Clifton v. Hopkins*, 107 S.W.3d 755, 757 (Tex.App.-Waco 2003, pet. denied). The nonmovant need not respond to the motion for summary judgment unless the movant meets its burden of proof. *Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 222–23 (Tex.1999). But if the movant meets its burden of proof, the nonmovant must present summary judgment evidence to raise a fact issue. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995).

We apply the same standard in reviewing the grant of a no-evidence summary judgment motion as we would in reviewing a directed verdict. *Ash*, 54 S.W.3d at 413. We review the summary judgment evidence in the light most favorable to the nonmovant, disregarding all contrary evidence and inferences. *Id.* A no-evidence motion will be defeated if more than a scintilla of probative evidence exists to raise a genuine issue of material fact on the element challenged by the movant. *Id.* More than a scintilla of evidence exists if it would allow reasonable and fair-minded people to differ in their conclusions. *Forbes, Inc.*, 124 S.W.3d at 172.

---

**4.** Asserting federal preemption under the PRSA, Baylor removed this case to federal district court, which denied Johnson's motion to remand and granted Baylor's motion to dismiss, but on appeal the Fifth Circuit reversed the district court, holding that the PRSA did not preempt Johnson's state law claim and that Baylor's removal was improper. *See Johnson v. Baylor Univ.*, 214 F.3d 630 (5th Cir.2000).

When a trial court's order granting summary judgment does not specify the ground or grounds relied on for the ruling, summary judgment will be affirmed on appeal if any of the theories advanced are meritorious. *State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 380 (Tex.1993); *Larsen v. Carlene Langford & Assocs., Inc.*, 41 S.W.3d 245, 249 (Tex.App.-Waco 2001, pet. denied).

### Analysis

*Defamation*

■ We first address Johnson's second issue, which asserts that the trial court erred in granting summary judgment on his defamation claim. Baylor filed traditional and no-evidence motions for summary judgment on this claim. Its traditional motion asserted that Johnson's defamation claim was barred by the one-year statute of limitations. The trial court granted both motions without stating any grounds.

The summary judgment evidence shows Johnson began working work for Kitty Hawk in August of 1997, starting his initial training on a probationary basis. After completing the first phase of training, Johnson took leave before he was to resume training at the end of September 1997. But Kitty Hawk sent Johnson a letter dated September 25, 1997, stating that he was being removed from Kitty Hawk's training schedule and that he was relieved from any further Kitty Hawk training or attendance.

In an August 14, 1997 letter to Baylor, Kitty Hawk had requested that Baylor provide it with Johnson's personnel records for the previous five years, as required by the PRSA. The basis of Johnson's defamation claim was Baylor's written statement to Kitty Hawk (through an August 25, 1997 pre-employment background report prepared by Accu–Screen, Inc. from information obtained from Baylor) that Johnson's employment with Baylor as a pilot had been terminated "involuntarily" for "conduct" reasons and that he was ineligible for rehire. Johnson claims that these statements were false.

Johnson stated in his affidavit that, when he inquired about the reason for Kitty Hawk's decision, he was told that the decision was based on information from Baylor. In March of 1998, Johnson obtained a copy of the documents that Kitty Hawk had received. He filed this suit on January 19, 1999, about sixteen months after being terminated by Kitty Hawk.

■ The statute of limitations for a defamation cause of action is one year. TEX. CIV. PRAC. & REM.CODE. ANN. § 16.002(a) (Vernon 2002). Ordinarily, the cause of action accrues on the date the defamatory matter is published. *See Langston v. Eagle Publishing Co.*, 719 S.W.2d 612, 615 (Tex.App.-Waco 1986, writ ref'd n.r.e.). The discovery rule applies to libel actions, and under this rule, the statute of limitation does not begin to run until the injured party learns of, or, in the exercise of reasonable diligence, should have learned of the injury or wrong giving rise to the action. *Id.* (citing *Kelley v. Rinkle*, 532 S.W.2d 947, 949 (Tex.1976)); *see also KPMG Peat Marwick v. Harrison County Fin. Corp.*, 988 S.W.2d 746, 749 (Tex.1999) ("accrual occurs when the plaintiff knew or should have known of the wrongfully caused injury"). The plaintiff need not know the specific nature of each wrongful act that may have caused the injury. *KPMG*, 988 S.W.2d at 749.

Because Johnson pled the discovery rule, Baylor had the burden of negating the discovery rule by proving as a matter of law that no fact issue existed on when Johnson discovered or should have discov-

ered the nature of the injury. *Rhone–Poulenc, Inc.*, 997 S.W.2d at 223; *Burns v. Thomas*, 786 S.W.2d 266, 267 (Tex.1990). Baylor argues that, because Johnson's injury (the loss of his job with Kitty Hawk) occurred in September 1997 and he was told then that his termination occurred because he had a "problem" with Baylor (*i.e.*, the information that Kitty Hawk had received from Baylor), Johnson's defamation claim accrued then and the statute of limitations began to run.

We agree with Baylor that Johnson knew or should have known of his wrongfully caused injury when he was dismissed by Kitty Hawk and told that it was because of the information Kitty Hawk had received from Baylor. Johnson knew or should have known then the facts that he later alleged—that his injury was the result of the wrongful conduct of others, *i.e.*, Baylor's providing information to Kitty Hawk. Because Johnson's defamation claim accrued more than one year before he filed suit, summary judgment on Baylor's limitations defense was proper. We overrule Johnson's second issue.

*Negligent Misrepresentation: First Element (Defendant Provides Information)*

Johnson's third issue asserts that the trial court erred in granting summary judgment on his negligent misrepresentation claim. Baylor filed traditional and no-evidence motions for summary judgment on this claim. Its traditional motion asserted that Johnson had released Baylor, while its no-evidence motion was based on the first, fourth, and fifth elements of negligent misrepresentation. The trial court granted both motions without stating any grounds.

Johnson pled that Baylor made false representations to Kitty Hawk about his discharge from Baylor. He also pled that Baylor falsely represented to Kitty Hawk that Johnson's personnel records were not available.

■ The elements of negligent misrepresentation are:

1. a defendant provides information in the course of his business, or in a transaction in which he has a pecuniary interest;

2. the information supplied is false;

3 the defendant did not exercise reasonable care or competence in obtaining or communicating the information;

4. the plaintiff justifiably relies on the information; and

5. the plaintiff suffers damages proximately caused by the reliance.

*Federal Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex.1991); *Larsen*, 41 S.W.3d at 249–50; *see also McCamish, Martin, Brown, & Loeffler v. F.E. Appling Interests, Inc.*, 991 S.W.2d 787, 791 (Tex. 1999) (citing *Sloane* and quoting section 552 of the Restatement (Second) of Torts).

■ Baylor moved for summary judgment on the ground that Baylor made representations to Kitty Hawk, not to Johnson, and that Johnson's negligent misrepresentation claim thus fails on the first element. Citing the above three cases, Baylor asserts that the first element of a negligent misrepresentation claim is that the defendant made a representation *to the plaintiff* in the course of the defendant's business or in a transaction in which the defendant had an interest. None of these cases, however, requires that the misrepresentation be made to the plaintiff.[5] *See,*

5. Section 552 narrows the class of potential claimants and requires that any claimant justifiably rely on the alleged negligent misrepresentation. *McCamish*, 991 S.W.2d at 793–94.

Under section 552(2), liability is limited to loss suffered:

(a) by the person or one of a limited group of persons for whose benefit and guidance

*e.g., Cook Consultants, Inc. v. Larson,* 700 S.W.2d 231, 233–36 (Tex.App.-Dallas 1985, writ ref'd n.r.e.) (surveyor that was hired by builder was liable to homeowner for surveyor's negligent misrepresentation).

In *Cook Consultants,* the court cited the following factors as considerations in determining whether the duty described in section 552 is owed in a particular case: (1) the extent to which the transaction was intended to affect the plaintiff; (2) foreseeability of harm to the plaintiff; (3) the closeness of the connection between the defendant's conduct and the injury suffered; and (4) the potential liability. *Id.* at 234–35. Kitty Hawk's request to Baylor for Johnson's records included Johnson's authorization to provide the records to Kitty Hawk. Applying these four factors, we find that Baylor owed Johnson a duty to exercise reasonable care in supplying his personnel records to Kitty Hawk, and more than a scintilla of evidence exists that Baylor made a representation to Kitty Hawk for Johnson's benefit; upon receiving Kitty Hawk's request for Johnson's personnel records, Baylor knew or should have known that Johnson was relying on Baylor to properly supply his records to Kitty Hawk. Summary judgment on this ground and element was error, and we sustain Johnson's third issue in this respect.

*Negligent Misrepresentation: Fourth Element (Justifiable Reliance)*

■ Baylor moved for summary judgment on the ground that there was no evidence that Johnson justifiably relied on the information supplied by Baylor to Kitty Hawk.

At his pre-employment interview with Kitty Hawk, Johnson informed Kitty Hawk that he had been terminated by Baylor because of his obesity, not because of his performance as a pilot. It is a reasonable inference that Johnson knew his personnel records, which included his annual evaluations and Dr. Reynolds's letters to Johnson about his problem with Johnson's obesity, grammar, and diction, would verify to Kitty Hawk that he had been terminated by Baylor because of his obesity, not because of his performance as a pilot. Further, Johnson knew and Baylor knew or should have known that the information Baylor would be providing to Kitty Hawk would influence Kitty Hawk's employment relationship with Johnson; Baylor (which had at least constructive knowledge of the PRSA's provisions on obtaining a pilot's personnel records) knew or should have known that Johnson was relying on Baylor to supply his records to Kitty Hawk because Kitty Hawk's request to Baylor for Johnson's records included Johnson's authorization to provide the records to Kitty Hawk. There is thus more than a scintilla of evidence that Johnson justifiably relied on Baylor's representations to Kitty Hawk about Johnson's personnel records. Summary judgment on this ground and element was error, and we sustain Johnson's third issue in this respect.

*Negligent Misrepresentation and Tortious Interference: Causation*

■ Baylor moved for summary judgment on the ground that there was no evidence that its alleged negligent misrepresentation caused Johnson's injury. The trial court had earlier granted Baylor's no-evidence motion for summary judgment on

[one] intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that [one] intends the information to influence or knows that the recipient

so intends or in a substantially similar transaction.
*Id.* at 794 (quoting Restatement (Second) of Torts § 552(a)).

causation on Johnson's claims for tortious interference with contract and tortious interference with prospective contract, which is the basis of Johnson's first issue.[6] Thus, we will address causation as to these three claims together, addressing the remainder of issue three and issue one as to causation.

 The elements of a claim for tortious interference with contract are:

 (1) a contract subject to interference exists;

 (2) the alleged act of interference was willful and intentional;

 (3) the willful and intentional act proximately caused damage; and

 (4) actual damage or loss occurred.

*ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex.1997).

 The elements of a claim for tortious interference with prospective contract are:

 (1) a reasonable probability that the parties would have entered into a contractual relationship;

 (2) an "independently tortious or unlawful" act by the defendant that prevented the relationship from occurring;

 (3) the defendant did such act with a conscious desire to prevent the relationship from occurring, or it knew that the interference was certain or substantially certain to occur as a result of the defendant's conduct; and

 (4) the plaintiff suffered actual harm or damage as a result of the defendant's interference.

*Ash,* 54 S.W.3d at 414–15. "Independently tortious" means conduct that would violate some other recognized tort duty. *Wal–Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 713 (Tex.2001).

 The Dallas Court of Appeals recently addressed the causation element for a tortious interference with prospective contract claim:

The second element of this tort requires that the independently tortious or wrongful act "prevented the relationship from occurring." The Texas Supreme Court has addressed the causation aspect of this element. *See Prudential Ins. Co. of Am. v. Fin. Review Servs. Inc.,* 29 S.W.3d 74, 83 (Tex.2000) (causation inquiry is whether defendant's alleged business disparagement caused injury to plaintiff's prospective contracts); *Hurlbut v. Gulf Atl. Life Ins. Co.,* 749 S.W.2d 762, 767 (Tex.1987) (business disparagement case; statement must play a "substantial part" in inducing others not to deal with the plaintiff, resulting in special damage, i.e., lost trade or other dealings).

We construe this element to require, at minimum, that the tortious conduct constitute a cause in fact that prevented the prospective business relationship from coming to fruition in the form of a contractual agreement. The test for cause in fact, or "but for causation," is whether the act or omission was a substantial factor in causing the injury "without which the harm would not have occurred." *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex.1995).

*COC Servs., Ltd. v. CompUSA, Inc.,* 150 S.W.3d 654, 679 (Tex.App.-Dallas 2004, pet. filed). We agree with this test and will apply it to Johnson's claim for tortious interference with prospective contract.

In his affidavit, Johnson stated: "When I inquired about the reason for Kitty

---

**6.** Only the no-evidence motion was granted on Johnson's tortious interference claims.

Hawk's decision, I was told that the decision was based on information furnished (and not furnished) by Baylor." It is not disputed that:

- In a letter dated August 14, 1997, in accordance with the PRSA, Kitty Hawk requested Johnson's personnel records from Baylor for the preceding five years because it was considering Johnson for employment as a pilot.

- Kitty Hawk's letter included a "Pilot Record Request Form" stating that it was a "request pursuant to U.S.C. Title 49 § 44936 also known as Title V— Pilot Record Sharing of the Federal Aviation Reauthorization Act of 1996," and that it was requesting that Baylor provide the records within thirty days.

- Baylor received Kitty Hawk's August 14 letter on August 18.

- Despite the PRSA's requirement (49 U.S.C. § 44703(h)(6)(A)) that Baylor notify Johnson that his records had been requested and that he had a right to receive a copy of his records, it did not notify Johnson.

- Baylor received records from Accu-Screen showing that Kitty Hawk was requesting information on Johnson's employment from 1991 to 1994.

- Baylor, in a September 11, 1997 letter to Kitty Hawk, responded that it did "not have personnel files readily available for individuals who worked for us this far back." But deposition testimony of Baylor personnel shows that Johnson's personnel records were accessible; they had been retained in the personnel office and then were transferred to the General Counsel's office. They had also been made a part of the record in Johnson's federal discrimination suit against Baylor.

- Kitty Hawk then wrote Johnson on September 25, 1997 that he was being

relieved from any further training or attendance.

The PRSA (the PRIA) provides in pertinent part:

(1) In general. Subject to paragraph (14), *before allowing an individual to* begin service as a pilot, an *air carrier shall request and receive* the following information:

(A) FAA records....

(B) Air carrier and other records.— From any air carrier or other person ... that has employed the individual as a pilot of a civil or public aircraft at any time during the 5–year period preceding the date of the employment application of the individual, ...

(ii) other records pertaining to the individual's performance as a pilot that are maintained by the air carrier or person concerning—

(I) the training, qualifications, proficiency, or professional competence of the individual, including comments and evaluations made by a check airman designated in accordance with section 121.411, 125.295, or 135.337 of such title;

(II) any disciplinary action taken with respect to the individual that was not subsequently overturned; and

(III) any release from employment or resignation, termination, or disqualification with respect to employment.

(C) National driver register records.—In accordance with section 30305(b)(8) of this title, from the chief driver licensing official of a State, information concerning the motor vehicle driving record of the individual.

49 U.S.C. § 44703(h)(1) (emphasis added).[7]

Under the PRSA, Kitty Hawk was prohibited from allowing Johnson to begin working as a pilot until it had received Johnson's personnel records for the preceding five years from Baylor. Baylor had actual or constructive knowledge that Kitty Hawk had to receive Johnson's personnel records to be able to allow him to work as a pilot.

We conclude that Johnson's affidavit testimony that Kitty Hawk's decision to dismiss Johnson was based on the records and information that Baylor did, and did not, furnish, combined with the applicable provisions of the PRSA and the undisputed fact that Baylor misrepresented to Kitty Hawk that Johnson's records were not readily available, is some evidence—more than a scintilla—that a cause in fact of Kitty Hawk's dismissal of Johnson was the misrepresentation and information that Kitty Hawk received from Baylor about Johnson's personnel records. There is some evidence that Baylor's misrepresentation about Johnson's personnel records was a substantial factor in Kitty Hawk's dismissal of Johnson.

Accordingly, it was error to grant Baylor's no-evidence motion for summary judgment on causation with respect to Johnson's tortious interference and negligent misrepresentation claims. We sus-

tain Johnson's first and third issues in this respect.

*Tortious Interference with Prospective Contract: Malice*

Baylor also moved for summary judgment on Johnson's claim for tortious interference with prospective contract on the ground that there was no evidence on what Baylor asserted was the second element of that claim: that Baylor acted with malice as to Johnson's prospective employment with Kitty Hawk. Specifically, Baylor asserted that there is no evidence "that any act of Baylor was malicious and intervened with the formation of the relationship...."

In so moving for summary judgment, and in its appellate brief, Baylor, citing *Richter v. Wagner Oil Co.*, states that it moved for summary judgment on the "malice element."[8] It argues that Johnson offered no evidence to show malice and cites section 41.001(7) of the Civil Practice and Remedies Code,[9] asserting that the most that Johnson could show was that Baylor was negligent in the way that it responded to Kitty Hawk's record request.

As we have noted above, the elements of a claim for tortious interference with prospective contract are:

(1) a reasonable probability that the parties would have entered into a contractual relationship;

(2) an "independently tortious or unlawful" act by the defendant that pre-

---

**7.** The purpose of the PRSA is to promote air safety through the hiring of qualified pilots, and it accomplishes its goal by ensuring the free exchange of pilot's records among pilot employers. *Sky Fun 1 v. Schuttloffel,* 27 P.3d 361, 367 (Colo.2001).

**8.** *Richter* states that the elements of tortious interference with prospective contract are:

(1) a reasonable probability the plaintiff would have entered a contractual relationship with a third-party;

(2) an intentional and malicious act that intervened with the formation of that relationship;

(3) the defendant lacked privilege or justification to interfere; and

(4) actual damage, loss, or harm resulted from the defendant's interference.

*Richter v. Wagner Oil Co.,* 90 S.W.3d 890, 897 (Tex.App.-San Antonio 2002, no pet.).

**9.** Malice is defined as "a specific intent by the defendant to cause substantial injury or harm to the claimant." TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(7) (Vernon Supp.2005).

vented the relationship from occurring;

(3) the defendant did such act with a conscious desire to prevent the relationship from occurring, or it knew that the interference was certain or substantially certain to occur as a result of the defendant's conduct; and

(4) the plaintiff suffered actual harm or damage as a result of the defendant's interference.

*Ash*, 54 S.W.3d at 414–15. We disagree with the elements set out in *Richter*.

 Malice, or malicious intent, is not an element of a claim for tortious interference with prospective contract, and Johnson was not required to present evidence of malice in response to Baylor's no-evidence summary judgment motion. *See id.* Summary judgment on this ground was error, and we sustain Johnson's first issue in this respect.

*Release*

 Baylor asserted the defense of release as the summary judgment ground in its traditional motion for summary judgment on Johnson's negligent misrepresentation.[10] Johnson's third issue asserts that summary judgment on this ground was improper.

Kitty Hawk's "Pilot Record Request Form" to Baylor included the following provision that had been signed by Johnson:

In accordance with U.S.C. Title 49 § 44936(f)(2)(B) this is to certify that I, _____ release from all liability for any claim arising from or furnishing of the above information to Kitty Hawk

AirCargo, Inc., or the use of such information to Kitty Hawk AirCargo, Inc. (other than a claim arising from furnishing information known to be false and maintained in violation of a criminal statute.)

The PRSA's written consent provision states:

(2) Written consent; release from liability.—An air carrier making a request for records under paragraph (1)—

(A) shall be required to obtain written consent to the release of those records from the individual that is the subject of the records requested; and

(B) may, notwithstanding any other provision of law or agreement to the contrary, require the individual who is the subject of the records to request to execute a release from liability for any claim arising from the furnishing of such records to or the use of such records by such air carrier (other than a claim arising from furnishing information known to be false and maintained in violation of a criminal statute).

49 U.S.C. § 44703(h)(2). The PRSA's liability limitation states:

(1) Limitation on liability.—No action or proceeding may be brought by or on behalf of an individual who has applied for or is seeking a position with an air carrier as a pilot and who has signed a release from liability, as provided for under paragraph (2), against—

(A) the air carrier requesting the records of that individual under subsection (h)(1);

(B) *a person who has complied with such request;*

---

10. In its traditional motion for summary judgment on Johnson's tortious interference claims, Baylor moved for summary judgment on its defenses of release and consent, but the trial court did not grant Baylor's traditional motion; it only granted Baylor's no-evidence motion on Johnson's tortious interference claims.

(C) a person who has entered information contained in the individual's records; or

(D) an agent or employee of a person described in subparagraph (A) or (B);

in the nature of an action for defamation, invasion of privacy, negligence, interference with contract, or otherwise, or under any Federal or State law with respect to the furnishing or use of such records in accordance with subsection (h).

(2) Preemption.—No State or political subdivision thereof may enact, prescribe, issue, continue in effect, or enforce any law (including any regulation, standard, or other provision having the force and effect of law) that prohibits, penalizes, or imposes liability for furnishing or using records in accordance with subsection (h).

(3) Provision for knowingly false information. Paragraphs (1) and (2) shall not apply with respect to a person who furnishes information in response to a request made under subsection (h)(1), that—

(A) the person knows is false; and

(B) was maintained in violation of a criminal statute of the United States.

*Id.* § 44703(i) (emphasis added).

Johnson asserts that his PRSA release that Kitty Hawk sent to Baylor does not bar his negligent misrepresentation claim because Baylor did not comply with Kitty Hawk's request, and the PRSA requires such compliance for the release and limitation of liability to apply. Section 44703(i)(1)(B) plainly provides that a person such as Johnson ("an individual who has applied for or is seeking a position with an air carrier as a pilot and who has signed a release from liability") may not bring an action against "a person who has complied with such request." Johnson argues that, because Baylor did not comply with Kitty Hawk's request and failed to provide his personnel records, Baylor is not entitled to rely on his PRSA release and liability limitation.

In support, Johnson relies on a Colorado case that apparently was one of first impression on the PRSA's liability limitation provision. *See Sky Fun 1 v. Schuttloffel*, 27 P.3d 361 (Colo.2001). In that case the pilot applicant, like Johnson, signed a consent and release form under the PRSA that allowed the prospective employer to obtain the pilot's prior employment records. *Id.* at 364. The prior employer responded to the request form with a note stating, "CALL ME!" but providing no records. The prospective employer called the prior employer, who stated that the pilot should not be hired because he was a threat to passenger safety. The prior employer called back several times and urged the prospective employer not to hire the plaintiff. Eventually, the prior employer prepared and sent a document titled "Termination Report" that detailed three incidents where the pilot allegedly acted dangerously. The pilot was hired anyway, and when his prior employer sued him for property damage, the pilot counterclaimed for defamation. The trial court found for the pilot on his defamation claim, and on appeal the prior employer argued that the PRSA consent and liability limitation immunized it from liability for defamation.

After discussing the statutory provisions and legislative history of the PRSA, the Colorado Supreme Court held that the PRSA liability limitation did not preempt the defamation claim against the prior employer where the defamatory verbal statements were not based on records supplied in response to the PRSA request, consent, and release. *Id.* at 365, 368.

Applying these principles of statutory construction, the common law of torts, federal preemption, and federalism in the case before us, *we hold that the*

*limited liability provision of the Act prevents suits based on the pilot records provided to a potential employer,* including the personnel records, and oral statements made in connection with explaining the circumstances and contents of such records. This interpretation carries out the Act's purpose of protecting public safety in matters of air commerce. *On the other hand, the wording of the Act and its committee report plainly demonstrate that Congress was also solicitous of a pilot's reputation and employment opportunities.* Protecting the public safety depends on the availability of qualified pilots. Accordingly, *Congress determined that pilot hiring decisions should be based on facts regarding the pilot' s training, skill, performance, and safety record.* The pilot applicant must sign a release of the records for the prospective employer and must anticipate that some verbal interchange will occur between past and prospective employers concerning the applicant and the records provided.

However, Congress did not broadly immunize oral statements; rather, it chose to utilize the term "record" as the operative though undefined term in the limitation of liability provision. We conclude that the preemptive terms of the Act do not affect Colorado common law defamation actions involving verbal assertions that the speaker knew to be false or the speaker made in reckless disregard of the truth, *when the verbal statements are not based upon the previous employer' s records.* Such is the case before us, which involves verbal statements calculated to ruin Schuttloffel's professional reputation and prevent his employment as a pilot.

*Id.* at 368 (emphasis added).

▮▮▮ We agree with the Colorado court's construction and application of the

PRSA, which essentially is that a prior employer must comply with the PRSA to avail itself of the act's consent, release, and liability limitation provisions. The PRSA does not broadly immunize a prior employer's conduct in responding to a request for personnel records. Instead, it contains a quid pro quo: if the prior employer complies with the request for personnel records, its liability is limited.

Johnson wanted Baylor to provide his personnel records to Kitty Hawk because he knew they would verify what he had already told Kitty Hawk in his pre-employment interview. He signed an authorization and agreed to release Baylor from liability in contemplation of Baylor providing Kitty Hawk with his records, which show that Baylor had terminated him for reasons (*i.e.,* obesity) other than his performance as a pilot. Johnson performed under the statute; Baylor did not. Baylor responded by misrepresenting that Johnson's records were not available.

A person such as Johnson ("an individual who has applied for or is seeking a position with an air carrier as a pilot and who has signed a release from liability") may not bring an action against "a person who has complied with such request." 49 U.S.C. § 44703(i)(1)(B). Baylor did not comply with Kitty Hawk's request. We thus hold that Baylor cannot avail itself of Johnson's PRSA release or the PRSA's liability limitation in the context of Johnson's negligent misrepresentation claim, and summary judgment on this ground was error. We sustain Johnson's third issue in this respect.

▮▮▮ Baylor also asserted that it was entitled to summary judgment based on the release contained in the following authorization:

I certify that information in this Application and related documentation is true and complete without qualification. I understand that Kitty Hawk may investigate my work and personal history and verify all data given on this application, on related papers and in interviews, and I authorize Kitty Hawk to do the same. This inquiry may include information as to my character, general reputation and personal characteristics, and I consent to the conduct of this inquiry and to the consideration of any statements or references of former employers that are given in response to the inquiry. I authorize all individuals, schools and employers given in response to the inquiry. *I authorize all individuals, schools and employers named except as specifically limited on this Application, to provide information requested about me, and I release them from liability for damages in providing this information.* I understand and acknowledge that any misrepresentation or omission of fact by me can result in immediate discharge. [Emphasis added.]

▇▇▇▇▇ Releases that are general and categorical are narrowly construed. *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 938 (Tex.1991); *Boales v. Brighton Builders, Inc.*, 29 S.W.3d 159, 167 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). If a release is capable of a certain or definite legal meaning or interpretation, then effect must be given to the parties' intentions as expressed within the language of the release. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). A release will be construed in light of the facts and circumstances surrounding its execution. *See Tricentrol Oil Trading, Inc. v. Annesley*, 809 S.W.2d 218, 221 (Tex. 1991).

As with the PRSA release, Johnson argues that this general release was predicated on Baylor providing his personnel records to Kitty Hawk. We agree and will construe the release narrowly and in light of the facts and circumstances of its execution. Johnson authorized Baylor to provide his personnel records and information and agreed to release Baylor "from liability for damages in providing this information." But as we emphasized above, the gist of Johnson's negligent misrepresentation claim is not that Baylor provided Kitty Hawk with negative information about him,[11] but that Baylor negligently misrepresented that Johnson's records were not available and did not provide them. Like with the PRSA release, the purpose of this general release was not realized, and we hold that it does not bar Johnson's negligent misrepresentation claim. Summary judgment on this release was error, and we sustain Johnson's third issue in this respect.

### Conclusion

The trial court properly granted summary judgment on Johnson's defamation claim, and we affirm that ruling. The trial court erred in granting summary judgment on Johnson's tortious interference and negligent misrepresentation claims. We reverse the trial court's rulings on those claims and remand the cause to the

11. For this reason, we find *Smith v. Holley*, 827 S.W.2d 433 (Tex.App.-San Antonio 1992, writ denied), relied on by Baylor, to be factually inapposite. Unlike the plaintiff there, Johnson's claim is not based on the content of the information that the prior employer provided or the mere fact that the prior employer provided information when the plaintiff claimed that it should not have. Johnson's claim is based on Baylor's negligent misrepresentation that his records were not available and the fact that Baylor did not provide them; Johnson was relying on Baylor to produce his records.

trial court for further proceedings consistent with this opinion.

Chief Justice GRAY provides a Special Note to clarify his participation in this case.

Chief Justice GRAY provides this Special Note to clarify his participation in this case.

I have not had an adequate amount of time to consider and vote on this case. I have just concluded two extensive dissenting opinions. One was an accelerated appeal and the other a much older criminal case, both of which were issued only one week before this case. *Roberts v. Roberts,* No. 10–05–00134–CV, 2006 WL 301099, 2006 Tex.App. LEXIS 1090 (Tex.App.-Waco Feb. 8, 2006, no pet. h.) (Gray, C.J., concurring and dissenting); *Tingler v. State,* No. 10–04–00224–CR, 2006 WL 300817, 2006 Tex.App. LEXIS 1087 (Tex. App.-Waco Feb. 8, 2006, no pet. h.) (Gray, C.J., dissenting). As Justice Vance is very aware, currently I am deeply involved in reviewing the draft opinion and working on an analysis of an appeal of a termination of parental rights case, also an accelerated appeal. That analysis has required that I read the entire record. I also had to review an opinion on a Petition for Discretionary review with a deadline that could not be moved. *See* Tex.R.App. P. 50. All these cases have a higher priority than this one. Of course, there are many other draft opinions and orders that have been submitted for my review during the relevant time period that I have reviewed and approved or commented upon, so that the bulk of the business of the Court continues to move forward, except on a few selected cases on which I need additional time for analysis.

So in this case, as well as other cases that Justices Reyna and Vance have chosen to issue without giving me adequate time to conduct my analysis, I will continue with the application of what I believe to be the priorities assigned by the legislature and the applicable rules. *See Cathey v. Meyer,* 115 S.W.3d 644, 673–674 (Tex. App.-Waco 2003) (Gray, C.J., dissenting), *aff'd in part, rev'd in part, Meyer v. Cathey,* 167 S.W.3d 327 (Tex.2005). I do not think that the internal administrative rules adopted by Justices Reyna and Vance can override those priorities set by the legislature and the high courts of this State.

It appears the desired result of the internal administrative rules is to keep me from conducting the analysis that I believe is necessary, including depriving me of the time necessary to prepare a dissenting or concurring opinion when I believe it is appropriate. To some extent it has already had that effect because they have chosen to issue opinions on the vote of only two justices and it has hastened or truncated my opinions in others.

I might could better understand, indeed justify, a procedure calling for some deadline by which an opinion should move on in the circulation process if we had not had a year-to-date clearance rate of 112% and an average time for a case to be pending in this Court of only just over 12 months at the time the internal rules were adopted in May of 2005. We have continued to be one of the highest producers for the disposition of cases of the 14 intermediate appellate courts in Texas, and would be so even without the majority issuing a few cases before I have finished my analysis and voted on the result.

So, I must ask, as should you: Why rush any case out the door without letting every judge have the time needed for their own review and analysis? I have waited for over five months for Justice Vance to vote on the disposition of a case. The majority's purported desire for a speedy disposi-

tion is especially ironic when you factor into the mix that I have almost a dozen draft opinions prepared that Justice Reyna now refuses to review under the procedures that have been in place in this Court for the past two years, long before and long after the majority's adoption of the internal administrative rules they so cherish. Likewise, Justice Vance refuses to review them. I will adjust, as I must if I want any of the cases assigned to me to ever be issued, though this will only result in a delay in the issuance of my opinions.

Thus, because I have not had an adequate amount of time to review the merits of this case, I am not prepared to cast a vote concurring or dissenting in the judgment of the other two justices. *See Tex. Genco, LP v. Valence Operating Co.,* 187 S.W.3d 118, 125–26 (Tex.App.-Waco, 2006, no pet. h.) (Special Note by Chief Justice Gray issued Jan. 25, 2006); *Krumnow v. Krumnow,* 174 S.W.3d 820, 830–842 (Tex. App.-Waco Aug.24, 2005, pet. filed) (Special Note by Chief Justice Gray issued Aug. 31, 2005).