Opinion issued May
20, 2010          

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 

 


In The

Court of
Appeals

For The

First District
of Texas

————————————

 

NO. 01-07-00370-CV

 


 
 
————————————

 

SILVER LION, INC., Appellant

 

V.

 

DOLPHIN STREET, INC. AND R. KENT LARSEN, Appellees


 
 

 
 
 

 



On Appeal from the 157th District Court

Harris County, Texas

Trial Court Cause No. 2005-63497

 


 
 

 
 
 

 



MEMORANDUM OPINION ON REHEARING

          Appellant,
Silver Lion, Inc. and appellees, Dolphin Street, Inc. and R. Kent Larsen, have
filed motions for rehearing of our May 21, 2009 memorandum opinion and
judgment.  We deny those motions.  We do, however, withdraw our May 21, 2009
memorandum opinion and judgment and issue this memorandum and judgment in their
stead.

          We
affirm the trial court’s judgment in part, holding that the evidence is legally
and factually sufficient to support the trial court’s findings that (1) Silver
Lion tortiously interfered with the sale of Dolphin Street and (2) Dolphin
Street and Larsen did not breach the Lease and Guaranty at issue.  

We sustain Silver Lion’s fourth issue
in part, holding that the trial court properly awarded attorney’s fees to
Larsen as a signatory to the Guaranty but erred in awarding attorney’s fees to
Dolphin Street because it was not a signatory to that Guaranty.  Accordingly, we reverse that part of the trial
court’s judgment awarding attorney’s fees to Dolphin Street and render judgment
in favor of Silver Lion on that issue.  

We also sustain Silver Lion’s second
issue and reverse the trial court’s finding that Silver Lion breached the Management
Agreement.  We render judgment for Silver
Lion on Dolphin Street and Larsen’s breach of contract claims based upon the
Management Agreement and vacate the trial court’s award of $100 to Dolphin
Street and Larsen.  

BACKGROUND

          In
April 2002, Silver Lion, as landlord, leased commercial space to Dolphin Street
for the operation of a nightclub.  The
lease agreement (“the Lease”) had a five-year term and was secured by a
guaranty agreement executed by Larsen, Dolphin Street’s owner (the
“Guaranty”).  Under the Lease, Dolphin
Street agreed to pay monthly rent, which would increase on an annual basis, and
to pay for maintenance of common areas of the premises. 

          In
November 2002, shortly after opening for business, Dolphin Street fell behind
on its rent.  In January 2003, Dolphin
Street executed a promissory note, assigning Esperanza Martinez a lien on the
furniture, fixtures, equipment and other assets of the club in exchange for
$163,000.  Ms. Martinez then forwarded a
check for January’s rent to Silver Lion. 
On January 29, 2003, Doug Butcher, Silver Lion’s representative, signed
a subordination agreement agreeing that any security interest Silver Lion had
or obtained in the future would be subordinated to Martinez’s interest. 

          In
March 2003, Larsen informed Butcher that Dolphin Street would not be able to
continue to pay rent.  Larsen and Butcher
agreed that it would be a “win/win” situation for both of them if Butcher
managed the club to keep it open until Larsen could find a buyer for the
business.  They believed that such an
arrangement would maintain Dolphin Street as a viable, ongoing business,
something Larsen could sell, and assist Butcher by “keeping his premises leased
and looking busy and keeping the value up.” 
Larsen and Butcher then entered into a Management Agreement that they
both drafted, effective March 31, 2003, under which Silver Lion agreed to pay
for the continued operation of the club for 90 days to enable Dolphin Street to
“find a buyer for the operations and to maintain continuity of Dolphin Street
nightclub, to protect the value of the operations, supporting lease and
location and to stop any accrual of additional operating debt on the part of
Dolphin Street, Inc.”  The Lease and
Larsen’s Guaranty are attached to the Management Agreement.  In the Management Agreement, the parties agreed
that any potential buyer of the business would be subject to the approval of
Silver Lion, and that Silver Lion would not unreasonably withhold that
approval.  

The Management Agreement
directly addressed the issue of future rent that would come due under the
existing Lease.  Paragraph 5 of the Management
Agreement states that Silver Lion would either “forgive or pay as an operating
expense all rents due during the period of the agreement.”  Further, the Management Agreement called for
Silver Lion to pay two types of operating expenses: (1) those incurred prior to
April 1, 2003—the time Larsen was operating the club—which the Management Agreement
called “prior obligations;” and (2) those incurred between April 1, 2003 and
the prospective sale of the club—the time Silver Lion was operating the club—which
Silver Lion would pay and for which it would not seek reimbursement.  As to the first category, the Management Agreement
called for Dolphin Street and Larsen to reimburse Silver Lion for “the amount
of prior obligations actually paid,” less $750. 
This reimbursement was to be made from the proceeds of the sale of the
club.  The Management Agreement also
stated that the list of “prior obligations” was to be attached to the
Agreement, and was to be updated to reflect all of the payments incurred prior
to April 1, 2003:

Dolphin Street, Inc. has the supporting Accounts
payable (attachment #2) as of 26 March 2003 and Tax Liability.  This list does not include an unknown amount
owed to Reliant Energy for electricity that has not been billed.  It is agreed that this list will be adjusted
to include all liabilities that were incurred or payable prior to 01 April 2003
that are not listed (collectively, prior obligations).  Landlord warrants that landlord will pay all
liabilities Dolphin Street, Inc. may owe to any taxing authority or
governmental entity in a manner to avoid incurring additional penalties.  

 

          A
copy of the Management Agreement was admitted into evidence at trial by both
sides.  The copy admitted by Dolphin
Street and Larsen contained two attachments relating to accounts payable.  The first, entitled “Vendor Balance Summary,”
listed several vendors with outstanding invoices as of March 26, 2003, totaling
$20,494.15.  Several handwritten codicils
addressed various vendors, with Larsen promising to pay certain vendors
directly, despite the Management Agreement’s requirement that Silver Lion do
so, “upon dispursal [sic] of fund [sic] from sale of club.”  A second document, entitled “Dolphin Street
Texas 1st Quarter 2003,” listed the taxes Larsen estimated were due to taxing
authorities for January, February, and March of 2003, totaling $
13,955.86.  

In contrast, Silver
Lion’s copy of the Management Agreement did not contain these attachments.  Instead, at trial, Butcher testified that he
had never seen the attachments to Larsen and Dolphin Street’s copy of the
Management Agreement, and that those documents did not match his recollection
of the list of accounts payable that Larsen gave him at the time they executed the
Management Agreement.  Butcher testified
that a different document had been attached as the list of accounts payable,
but that the vendors listed had been substantially similar.  The document Butcher testified was attached
contained the notation “Insurance Cancelled Apr 03” and indicated that three of
the accounts were “paid and current” despite showing a balance.  Larsen stated that Butcher himself made those
notations. 

          The
Management Agreement also lists several vendors to whom Dolphin Street acknowledged
it owed money, and noted that these vendors held personal guarantees from
Larsen.  Silver Lion promised to keep
current on the payments to these vendors “so as to limit credit or legal action
against Mr. Larsen.”  Silver Lion
promised to indemnify and hold Larsen harmless from “any and all liabilities,
claims and causes of action raised by third parties, taxing authorities or
governmental entities which in any way relate to the management of the business
of Dolphin Street, Inc. or the operation of Dolphin Street nightclub after the
date of this agreement.”  

           Soon after Butcher, on behalf of Silver Lion,
began managing the nightclub, he discovered that Dolphin Street and Larsen had
not provided him a complete list of accounts payable.  Various vendors began demanding past due
payments.  Butcher testified that the
cash flow of the business was so poor that he had his family members work in
the business to reduce costs, and that he worked in the club on weeknights as a
DJ to save money on entertainment.  In
May 2003, almost three months after Silver Lion began operating Dolphin Street,
the Texas Comptroller placed a freeze on Dolphin Street’s assets for failure to
pay franchise, sales, and mixed beverage gross receipts taxes.  Other expenses incurred during this time also
went unpaid, as did obligations incurred prior to Silver Lion’s assumption of
the nightclub’s management.  In all, Larsen
testified at trial that he eventually paid $32,369.91 in past due debts,
penalties, and interest that he claimed were either incurred while Silver Lion
was managing the club or were pre-existing debts that Silver Lion had agreed to
pay under the Management Agreement.  In
mid-May, Larsen learned that the insurance on the nightclub had been cancelled
because the premiums had not been paid. 
Based on these developments, Larsen and Butcher agreed to close the
nightclub.

          Prior
to the club’s closure, a potential buyer had expressed interest in the
business.  The buyer, Jack Speer, offered
to purchase Dolphin Street from Larsen for $115,000.  During the negotiations between Larsen and
Speer, Butcher sent Speer’s attorney two letters indicating that Dolphin Street
owed Silver Lion $19,288.26 in back rent for the months of April, May and June
2003, plus an additional amount for the expenses that Silver Lion had paid on
Dolphin Street’s behalf.  According
to Larsen, Butcher stated that Silver Lion would withhold its approval of Speer
as a purchaser for the club unless Speer paid Silver Lion for the club’s rent
in April, May and June of 2003, plus additional expenses that Silver Lion had
incurred by managing the club. 

          Speer
ultimately decided not to purchase Dolphin Street.       Dolphin Street was not reopened after its initial
closure.  Instead—months later—Speer
opened an entirely new nightclub in the same space by forming a new
corporation, purchasing many of Dolphin Street’s assets from Esperanza Martinez
and entering into a new and independent lease with Silver Lion.

          Silver
Lion sued Larsen and Dolphin Street, Inc. for breaching the original Lease and
the Management Agreement, and for fraud. 
Dolphin Street and Larsen counterclaimed for breach of the Management Agreement,
conversion, indemnity, and tortious interference with a prospective contract,
namely Speer’s purchase of the club. 
Both sides sought attorney’s fees. 
After a bench trial, the trial court entered judgment that Silver Lion
take nothing on its claims and awarding damages to Dolphin Street and Larsen on
their claims for tortious interference ($115,000), breach of contract ($100),
and attorney’s fees.  The trial court
entered findings of fact and conclusions of law, including the following
findings of fact:

          .
. . . 

3. Effective April 01, 2003, when Dolphin Street, Inc.
could no longer continue making its lease payments the parties materially
amended the lease by a Management Agreement whereby Silver Lion, Inc., at its
sole expense and liability would operate the “Dolphin Street” nightclub for 90
days while the parties sought a purchaser.

 

4. Silver Lion, Inc. materially breached the
Management Agreement relieving both Dolphin Street, Inc. and R. Kent Larsen
from performance of the lease and guaranty.

 

5. Silver Lion, Inc.’s breach of the Management
Agreement resulted in nominal $100 damages to Dolphin Street, Inc. and R. Kent
Larsen.

 

6. Silver Lion, Inc. tortiously interfered with the
purchase and sale contract for Jack Speer to purchase Dolphin Street, Inc. and
satisfy the lease obligations.

 

7. The tortious interference by Silver Lion, Inc. with
the purchase and sale contract has damaged R. Kent Larsen, in the amount of
$115,000.00.

 

          On
appeal, Silver Lion argues that the evidence is legally and factually
insufficient to support the trial court’s findings that (1) Silver Lion
tortiously interfered with a prospective contract between Dolphin Street,
Larsen and Speer; (2) Silver Lion breached the Management Agreement; and (3)
Dolphin Street and Larsen’s failure to pay rent was excused.  Additionally, Silver Lion argues that Dolphin
Street and Larsen failed to plead the affirmative defense of excuse.  Finally, Silver Lion challenges the trial
court’s award of attorney’s fees to Dolphin Street and Larsen on the grounds
that the trial court awarded only nominal damages for their breach of contract
claims, and they raised no other grounds upon which they could be awarded
attorney’s fees.  

          Dolphin
Street appeals the trial court’s award of only $100 in damages for Silver Lion’s
alleged breach of the Management Agreement.

ANALYSIS

I.                    
Tortious Interference

          In
its first issue, Silver Lion complains that the evidence is legally and
factually insufficient to support the trial court’s finding that it tortiously
interfered with a prospective contract. 
We disagree.

A.  
Standard of Review

 

          Findings
of fact in a nonjury trial have the same force and dignity as a jury’s verdict;
however, they are not conclusive when a complete reporter’s record appears in
the appellate record.  Lewis v. Dallas
Soundstage, Inc., 167 S.W.3d 906, 912 (Tex. App.—Dallas 2005, no pet.); see
also Bernal v. Chavez, 198 S.W.3d 15, 18 (Tex. App.—El Paso 2006, no
pet.).  When a complete reporter’s record
is filed, the trial court’s fact findings may be reviewed for legal and factual
sufficiency under the same standards as jury verdicts.  Lewis, 167 S.W.3d at 912.  In doing so, we do not substitute our
judgment for that of the fact finder, even if we would have reached a different
conclusion when reviewing the evidence. 
Id.  

          In deciding whether legally
sufficient evidence supports a challenged finding, we must consider evidence
favorable to the finding if a reasonable fact finder could consider it and
disregard evidence contrary to the finding unless a reasonable fact finder
could not disregard it.  City of
Keller v. Wilson, 168 S.W.3d 802, 822, 827 (Tex. 2005).  Circumstantial evidence may be used to
establish any material fact, but it must establish more than mere
suspicion.  Lozano v. Lozano, 52
S.W.3d 141, 149 (Tex. 2001) (citing Browning-Ferris, Inc. v. Reyna, 865
S.W.2d 925, 928 (Tex. 1993)).  Only
reasonable inferences drawn from the known circumstances establish a material
fact.  Id. (inference is merely a deduction from proven
facts).  We consider the totality of the
known circumstances in determining the legal sufficiency of the circumstantial
evidence and the reasonable inferences to be drawn from it.  See Felker v. Petrolon, Inc., 929 S.W.2d
460, 464 (Tex. App.—Houston [1st Dist.] 1996, writ denied). 

          When
an appellant attacks the legal sufficiency of an adverse finding on an issue on
which it did not have the burden of proof, it must demonstrate that no evidence
supports the finding.  Croucher v.
Croucher, 660 S.W.2d 55, 58 (Tex. 1983).  When attacking the legal sufficiency of the
evidence to support an adverse finding on an issue for which they had the
burden of proof, appellants must demonstrate the evidence conclusively
established all vital facts in support of the issue.  Sterner v. Marathon Oil Co., 767 S.W.2d
686, 690 (Tex. 1989); Marrs & Smith P’ship v. D.K. Boyd Oil & Gas Co., 223 S.W.3d
1, 13–14 (Tex. App.—El Paso 2005, pet. denied). 


          In
reviewing the factual sufficiency of the evidence to support a trier of fact’s
finding, we conduct a neutral review of all the evidence and set aside the
finding only if it is “so against the great weight and preponderance of the
evidence as to be clearly wrong and unjust.” 
Ortiz v. Jones,
917 S.W.2d 770, 772 (Tex. 1996); see also Minucci v. Sogevalor, S.A., 14
S.W.3d 790, 794 (Tex. App.—Houston [1st Dist.] 2000, no pet.).  

B.  
     Elements
of Claim

 

          To
establish a cause of action for tortious interference with prospective business
relationships, a plaintiff must show that (1) there was a reasonable
probability that the parties would have entered into a business relationship;
(2) the defendant committed an independently tortious or unlawful act that
prevented the relationship from occurring; (3) the defendant either acted with
a conscious desire to prevent the relationship from occurring or knew the
interference was certain or substantially certain to occur as a result of the
conduct; and (4) the plaintiff suffered actual harm or damages as a result of
the defendant’s interference. 
Richardson-Eagle, Inc. v. William M. Mercer, Inc., 213 S.W.3d 469,
475 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (citing Wal-Mart
Stores, Inc. v. Sturges, 52 S.W.3d 711, 713 (Tex. 2001)); Brown v. Swett
& Crawford of Texas, Inc., 178 S.W.3d 373, 381–82 (Tex. App.—Houston
[1st Dist.] 2005, no pet.)  Here, Silver
Lion argues that the evidence is legally and factually insufficient to
establish a claim for tortious interference because Dolphin Street produced no
evidence that Silver Lion’s actions amounted to an independent tort or unlawful
act that actually prevented the sale from going forward.  Silver Lion also argues that the evidence is
legally and factually insufficient to establish a claim because Silver Lion did
not intend for its representations to interfere with the sale.  We examine each of these arguments in turn. 

1. 
Independent Tort or Unlawful Act

          To
establish a tortious interference claim, Dolphin Street was required to provide
evidence that Silver Lion’s conduct amounted to an independent tort or unlawful
act.  See, e.g., Richardson-Eagle, Inc., 213
S.W.3d at 475.  It is undisputed that, in
a letter dated May 3, 2003, Silver Lion represented to Speer, the prospective
buyer, that upon the closing of the sale, Silver Lion was owed $19,288.26 in
past due rent for the months of April, May and June of 2003, in addition to the
expenses that Silver Lion had paid on behalf of Dolphin Street.  It is also undisputed that Silver Lion wanted
Speer to pay these sums to Silver Lion from his escrow account and that Silver
Lion would withhold its approval of the sale to Speer if payment was not
made.  In this case, Dolphin Street
provided legally and factually sufficient evidence that these statements to
Speer were fraudulent misrepresentations.

          First,
Dolphin Street produced evidence that these representations regarding the
amount of past due rents were false and that Silver Lion either knew that the
statements were false or made them recklessly without any knowledge of the
truth and as a positive assertion. 
Specifically, there is evidence demonstrating that, in the Management
Agreement, Silver Lion had promised to forgive, or itself pay, the rent for April,
May, and June of 2003, and it therefore had no contractual right to receive
these payments from anyone upon the sale of Dolphin Street.  At trial, Larsen testified that, under the
terms of the Management Agreement, the rents for April, May, and June 2003 were
to be forgiven and were not to be paid to Silver Lion from the club’s sale
proceeds.  Similarly, the clear and
unequivocal language of Paragraphs 5 and 14 of the Management Agreement mandated
that rents coming due during the period of the Management Agreement were to be
either (1) forgiven outright or (2) paid as operating expenses by Silver Lion
and then used to calculate whether Silver Lion made a profit or a loss from its
operation of the club.  This profit or
loss would accrue to Silver Lion, not to Dolphin Street or a subsequent buyer:

5.       Landlord will forgive or pay as an
operating expense all rents due Silver Lion, Inc. during the period of this
agreement.

 

. . . .

 

14.     It is understood that any profit or loss
from the operation of the Dolphin Street Club during the period of landlord’s
management hereunder shall be for the account of the landlord.

 

(emphasis added).  

          Second,
the evidence shows that Silver Lion intended Speer to rely on Butcher’s
statements that these three months’ rent was due and had to be paid to Silver
Lion at the time of the closing. 
Butcher, acting on behalf of Silver Lion, made these representations when
responding to an inquiry by Speer’s attorney, who was trying to determine the
amount of Dolphin Street’s outstanding liabilities that would need to be paid
if the sale was completed.  At the time
these representations were made, Speer had in fact already paid some of Dolphin
Street’s outstanding liabilities in anticipation of the sale going
through.  Speer had also set up an escrow
account to pay any additional outstanding liabilities that needed to be paid at
the time of closing.  In addition, Larsen
testified that Butcher told him that Silver Lion would withhold its consent to
the sale unless it received payment of the rent for April, May, and June of
2003 from the sales proceeds.  Larsen’s
testimony is supported by the language of the Landlord’s Consent to the sale to
Speer, signed by Silver Lion but never signed by either Speer or Larsen,
requiring Speer to agree to pay Silver Lion these allegedly past due rents from
the sales proceeds.

          As
the Texas Supreme Court explained in Sturges, such evidence of
fraudulent statements can support a claim for tortious interference with a
prospective contract: 

By independently tortious we do not mean that the
plaintiff must be able to prove an independent tort.  Rather, we mean only that the plaintiff must
prove that the defendant’s conduct would be actionable under a recognized
tort.  Thus, for example, a plaintiff
may recover for tortious interference from a defendant who makes fraudulent
statements about the plaintiff to a third person without proving that the third
person was actually defrauded.  If,
on the other hand, the defendant’s statements are not intended to deceive . . .
then they are not actionable. . . . .  These
examples are not exhaustive, but they illustrate what conduct can constitute
tortious interference with prospective relations.

 

52 S.W.3d at 713 (emphasis added).[1]

          Nevertheless,
Silver Lion, relying in part on paragraph 8 of the Management Agreement,
contends that there is evidence that its representations to Speer regarding
past due rents were “reasonable” and made in “good faith” under the terms of the
Management Agreement, and therefore there is no evidence that it intended to
deceive Speer and these representations cannot serve as the basis of a tortious
interference claim.  We disagree.  

          Contrary
to Silver Lion’s argument on appeal, paragraph 8 of the Management Agreement
does not provide any “good faith” or “reasonable” basis for Butcher’s representations
to Speer.  This paragraph states that,
upon the sale of the nightclub, Silver Lion shall be repaid only for those
amounts that were (1) incurred prior to the formation of the
Management Agreement and (2) actually paid by
Silver Lion.  This paragraph provides in
pertinent part that:

          8.
      Upon the sale of Dolphin
Street, Inc. or Dolphin Street nightclub the amount of the prior obligations
actually paid by landlord (less $750 pass on at transfer) will be
reimbursed to landlord from the sales proceeds.  In the event the amount that is due at the
time of sale is less than the prior obligations actually paid by landlord the
entirety of the net sales proceeds will be paid to the landlord.

 

(emphasis added).  In this case, it was undisputed that the rent
obligations that Butcher represented to Speer’s attorney were due were incurred
after the date of the Management Agreement—March 31, 2003.  Thus, they are not “prior obligations”
eligible for reimbursement under the Management Agreement.  Further, there is no evidence that Silver
Lion accounted for these rents as “actually paid” on its books.[2]

          Finally,
Silver Lion argues that its representations to Speer regarding past due rents
cannot be the basis of a tortious interference claim because they are
representations regarding a point of law or the legal effect of a document and,
as such, are not actionable.  We
disagree.  As a general rule, a
representation regarding a point of law or the legal effect of a document is a
statement of opinion rather than of fact and will not ordinarily support an
action for fraudulent misrepresentation. 
Fina Supply, Inc. v. Abilene Nat’l Bank, 726 S.W.2d 537, 540 (Tex. 1987); see
also Transport Ins. Co. v. Faircloth,
898 S.W.2d 269, 276 (Tex. 1995) (“[A]n actionable representation is one
concerning a material fact; pure expressions of opinion will not support an action
for fraud.”).  However, even a
misrepresentation regarding the law or the legal effect of a document is
actionable if it amounts to a misrepresentation of fact or was intended and
understood as a statement of fact.  See,
e.g., Placer Energy Corp. v. E
& S Oil Co., Inc., 692 S.W.2d 197, 200 (Tex. App.—Fort
Worth 1985, no writ) (defendant who misrepresented that requirement of statute
of frauds was satisfied was liable for resulting damages); Marlow v. Medlin, 558 S.W.2d 933, 938 (Tex.
Civ. App.—Waco 1977, no writ) (statement as to statute of frauds was actionable
because intended and understood as statement of fact).  

          Here,
there is evidence that these representations were positive assertions of
material fact made in response to Speer’s attorney’s inquiry as to the total
amount of Dolphin Street’s outstanding liabilities that needed to be paid at
the closing.  The representations that
serve as the basis of Dolphin Street’s claim for tortious interference are
found in the May 3, 2003, letter written by Butcher in response to inquiries by
Speer’s attorney regarding the total amount of liabilities owed by Dolphin
Street.  In this letter Butcher, on
behalf of Silver Lion, states the following to Speer’s attorney:

Travis: 

 

Please allow this fax to serve as to the items owed to
Silver Lion, Inc upon the closing of the transaction with Kent Larson [sic] for
the acquisition of Dolphin St. Inc.

 

                   April
Base Rent        $5,264.67

                   April
CAM                $1,164.75

                   May
Base Rent          $5,264.67

                   Base
Rent June          $5,264.67

                                                                   June
CAM                 $1,164.75

 

Total Lease Obligations Due                   $19,288.26

 

Water Bill City                                           $493.59 

 Water Bill City                                          $162.46

 

Total Water Bills Paid by
Landlord          $656.05

 

Total Due Silver Lion, Inc. on
Closing     $19,944.31  

 

These items are all owed to the landlord/Silver Lion,
Inc. to bring the lease and all obligations current through June.  

 

James D. Butcher

Co-President,
Silver Lion

Contrary to Silver Lion’s arguments,
nowhere in Butcher’s letter does he state that his representations are based on
his interpretation of the legal effect of the Management Agreement between
Silver Lion and Dolphin Street, an agreement to which Speer was not a signatory.
 In fact, the Management Agreement is not
even referenced, in any way, in the letter to Speer.  There is also no evidence that Speer was
involved in the negotiation or formation of this agreement between Silver Lion
and Dolphin Street.  Instead, Butcher
states as a positive assertion of fact that these items are owed to Silver Lion
upon the closing of the sale and sets out the items and specific amounts due in
his letter in response to Speer’s inquiry. 
As we held above, Dolphin Street produced evidence that these representations
regarding the amount of past due rents were false and that Silver Lion either
knew that the statements were false or made them recklessly without any
knowledge of the truth and as a positive assertion.[3]

          We
also disagree with Silver Lion’s argument that no fraudulent representation
regarding unpaid past rents can be shown because (1) Butcher signed a document
in the offices of Speer’s attorney stating that Speer agreed to pay
approximately $25,000 from the escrow funds for unpaid rent to Silver Lion upon
closing and (2) this  document
constitutes evidence that Larsen and Dolphin Street participated in making the
fraudulent representations to Speer.  A
review of this document reveals that, although the document contains signatures
blocks for both Larsen and Speer, neither of them ever executed this
document.  Further, Larsen testified that
he later learned that Butcher had continued to identify to Speer additional
moneys he wanted from the escrow for the sale and Speer apparently became
concerned about the adequacy of the escrow funds and Butcher’s “appetite for
money” and decided to not go through with the sale.  

          We
hold that the evidence was legally and factually sufficient to establish that
Silver Lion committed an independent tort or unlawful act.  See,
e.g., City of Keller, 168 S.W.3d at 822, 827; Ortiz v. Jones, 917 S.W.2d at 772.

2. 
Actual Interference

          To
establish a tortious interference claim, Dolphin Street had the burden to show
that Silver Lion’s fraudulent representations prevented the sale from
occurring.  Texas courts have construed
this element to require, at a minimum, that the fraudulent representations
constitute a cause in fact that prevented a contract from forming.  The test for cause in fact, or “but for
causation,” is whether the act or omission was a substantial fact in causing
the injury without which the harm would not have occurred.  Johnson v. Baylor Univ., 188 S.W. 3d 296,
304 (Tex. App.—Waco 2006, pet. denied).

          Silver
Lion argues that there is no evidence that Butcher’s representations caused the
sale to fall through because Speer’s testimony at trial conclusively
establishes that it was Speer caused the deal to fail, not any false statements
made by Butcher.  Silver Lion points to
Speer’s testimony, in response to a question as to whether he would have
purchased the club if not for Butcher’s actions, that “It wasn’t just Mr.
Butcher I was having problems with, it was several things. . . .  It was several things, it wasn’t just Mr.
Butcher or it wasn’t just Mr. Larsen, most of it was Mr. Speer, I didn’t feel
comfortable.”

          Other
evidence, however, contradicts Speer’s testimony.  For example, Larsen testified about the
circumstances surrounding the sale, including those that prevented the sale
from going through.  This testimony
reveals that both Larsen and Speer thought that they had a “done deal” sometime
in late June 2003: (1) all of the papers had been prepared, and Larsen signed
them and returned them to Speer for signature; (2) Speer signed a letter of
intent outlining the deal and his accountant had prepared a detailed loan
proposal to be submitted to a bank; (3) Speer’s lawyer prepared a draft
purchase and sale agreement, a seller’s indemnity agreement, a landlord’s
indemnity agreement and a purchaser’s indemnity agreement; and (4) Speer paid
the July rent to Silver Lion.  According
to Larsen’s testimony, the reason the sale did not go through after all this
work had been completed was because “Mr. Butcher persisted in demanding
additional moneys outside the scope of our management agreement” from the
proceeds of the sale to Speer and Speer was concerned about the possibility
that Silver Lion might file a  lawsuit. 

          The
resolution of whether Butcher’s false representations prevented the sale from
occurring turns almost entirely on the credibility of the testimony of the two
parties to the sale of Dolphin Street: Speer and Larsen.  The trial court, sitting as fact finder, was
the sole judge of the witnesses’ credibility and the weight to give their
testimony.  City of Keller, 168
S.W. 3d at 819.  It was free to believe
one witness and disbelieve another.  See
id.  As a reviewing court, we cannot impose our own
opinion to the contrary.  Id.  Instead, we must assume that the trial court
decided credibility questions in accordance with its fact findings if a
reasonable person could do so.  See id. 
Reviewing all the evidence under this standard, we assume that the trial
court credited testimony that supports its findings of fact and disbelieved
testimony contrary to them.  See id.  Nor is it necessary to have testimony from
both parties before the trial court may disbelieve either.  Id. at 819–20.  A trial court may disregard even
uncontradicted and unimpeached testimony from disinterested witnesses. 
Id.  Of course,
a trial court’s credibility decisions must be reasonable.  Id. 
It cannot ignore undisputed testimony that is clear, positive, direct,
otherwise credible, free from contradictions and inconsistencies, and could
have been readily controverted.  Id.  Furthermore, it is not free to believe
testimony that is conclusively negated by undisputed facts.  Id. 
But whenever a trial court may decide what testimony to discard, a
reviewing court must assume that the trial court did so consistently with its
fact findings, and disregard it in the course of legal sufficiency review.  See id.

          Here,
both Speer and Larsen testified that the sale was almost complete at or near
the time of Butcher’s misrepresentations and Larsen specifically testified that
these false statements were a cause of the sale falling through.  The record does not contain any undisputed
facts that would conclusively negate Larsen’s testimony.  See id.  Furthermore,
Speer’s testimony is far from clear, positive and direct on the issue of
whether Butcher’s representations were a cause in fact of the sale not
occurring.  At first, Speer testified
that there were “several reasons” for the sale falling through, including
“another investment” that was not identified as well as the conduct of both
Larsen and Butcher: 

Q: Do you recall why your purchase for Dolphin Street
did not go through?

 

A: Yes, there were several reasons it didn’t go
through.  First off, it was my decision.  I was looking at another investment.  I was buying the whole corporation.  I couldn’t get an answer from Mr. Butcher or
Mr. Larsen as to exactly what was owed and where.  And I know your indemnity agreements and
stuff like this, but it wasn’t my first time around the block.

 

Q:  Okay.  Can you recall some of the critical reasons?

 

A:   . . . I
just didn’t feel comfortable with it.  I
couldn’t get a—the main reason is Mr. Butcher or Mr. Larsen couldn’t tell me
the debt load on it, the liabilities against it, not down to the penny, not
down to the hundred, not even a thousand, not
even $10,000, because they were both - it was getting kind of touchy between
the two of them.  And I started feeling
like a piece of meat between two pieces of bread, and I’m not going to feel
that way when I’m trying to buy a business. 
That was a critical part.

 

When pressed further, Speer testified
that it was not “just” Butcher’s or “just” Larsen’s conduct that caused the
deal to fail but that “most of it was Mr. Speer” because Speer became
uncomfortable with the deal.  Speer
testified as follows:

Q: If you had not encountered the problems with Mr.
Butcher, would you have completed the purchase for Dolphin Street?

 

A: It wasn’t just with Mr. Butcher I was having
problems with, it was with several things.

 

Q: Go ahead.

 

A: It was several things, it wasn’t just Mr. Butcher
or it wasn’t just Mr. Larsen, most of it was Mr. Speer, I didn’t feel comfortable.

 

          It
was not unreasonable for the trial court to conclude that Speer’s testimony was
not credible and disregard this testimony in reaching its verdict.  The trial court could have discredited Speer’s
testimony because he appeared to have a reason to testify favorably to Silver
Lion and Butcher.  The record reflects
that Speer had ongoing business relations with Silver Lion at the time of trial
and would not have appeared at trial without a subpoena.  After the deal fell through with Larsen, Speer
purchased the physical assets of Dolphin Street from Esperanza Martinez, and
Silver Lion was his current landlord. 
Finally Speer’s testimony as to his state of mind at the time of the
closing, i.e., that he did not close the sale because he was not
“comfortable” with the deal, is not conclusive on the issue of causation in
light of the other evidence presented at trial. 
See City of Keller, 168 S.W. 3d at 819–20. 

          Under
these facts and reviewing the record as a whole, under the applicable standard
of review, we hold the evidence is legally sufficient to establish the
causation element of Silver Lion’s tortious interference claim. See, e.g., City of Keller, 168
S.W.3d at 822, 827.  Similarly, reviewing
the entire record as a whole and giving deference to the trial court’s
credibility determinations, we also hold that the evidence is factually
sufficient to establish that Butcher’s representations were a cause in fact of
the failure of the sale. See, e.g., Ortiz
v. Jones, 917 S.W.2d at 772.

3. 
Intent to Interfere

          To
establish a tortious interference claim, Dolphin Street also had the burden to
show that Silver Lion intended its representations to interfere with the
sale.  “Interference is intentional if
the actor desires to bring it about or if he knows that the interference is
certain or substantially certain to occur as a result.”  Baty v. Protech Ins. Agency, 63 S.W. 3d
841, 859–60 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).  

          In
this case, the evidence establishes that Silver Lion intended to interfere with
the formation of a contract between Dolphin Street and Speer by making false
statements about the past due rent owed. 
Specifically, Larsen testified that Silver Lion told him that it would
withhold consent to the sale unless Speer paid Dolphin Street’s past due rent
with the sales proceeds.  Silver Lion
made clear in the language of the Lease Extension, which was necessary to allow
time for closing the sale of the nightclub, that it would require Speer to pay
the past rent for April 2003.  Similarly,
the Landlord’s Consent through which Silver Lion agreed to the sale to Speer,
also required Speer to agree to pay Silver Lion the past due rents for April,
May, and June 2003 from the sales proceeds of any contract between Speer and
Dolphin Street.  Both of these documents
were executed by Butcher on behalf of Silver Lion.  Finally, both Larsen and Speer testified that
the false statements were made directly to Speer at or near a time when they
considered the sale close to completion. 


          Nevertheless,
Silver Lion argues that the evidence that it intended to interfere with the
Speer/Dolphin Street relationship is insufficient because there is undisputed
evidence that Silver Lion wanted the sale to close and not fail.  We find this argument unpersuasive.  While Silver Lion may have desired a sale to
be completed, the evidence reviewed above establishes that (1) Silver Lion did
not want any sale to be completed if it did not include the payment of the
rents it alleged were owed to it, in spite of the Management Agreement, and (2)
Silver Lion made the false representations to Speer and drafted language into
the Lease Extension and Landlord Consent to ensure that Silver Lion would
receive such payment from the proceeds of the sale of Dolphin Street to
Speer.  Particularly in light of the
specific language of the Management Agreement—which did not entitle Silver Lion
to the rents it demanded Speer pay—we conclude the evidence supports a finding
that Silver Lion intended to interfere with the formation of a contract between
Dolphin Street and Speer and not merely that Silver Lion’s legitimate conduct
resulted in incidental interference. 
Accordingly, reviewing the record under the applicable standards of
review, we hold that there is also legally and factually sufficient evidence to
establish this element of a tortious interference claim.  See,
e.g., City of Keller, 168 S.W.3d at 822, 827; Ortiz v. Jones, 917 S.W.2d at 772.

          We
overrule Silver Lion’s first issue.  

II.           
Breach of Management Agreement

          In
its second issue, Silver Lion argues that the evidence supporting the trial
court’s finding that it breached the Management Agreement is legally and
factually insufficient, and that this Court should set aside the trial court’s
award of even nominal damages to Dolphin Street because there was no evidence
that Dolphin Street or Larsen sustained any damages at all.  

A.   Standard
of Review

 

          Silver
Lion challenges the trial court’s finding that it breached the Management
Agreement for legal and factual sufficiency. 
Accordingly, we apply the same standard of review under which we
analyzed the previous points.  See, e.g., City of Keller, 168
S.W.3d at 822, 827; Ortiz v. Jones,
917 S.W.2d at 772.

B.  
Elements of Claim    

 

          The
essential elements in a suit for breach of contract are: (1) the existence of a
valid contract; (2) the plaintiff performed or tendered performance; (3) the
defendant breached the contract; and (4) the plaintiff was damaged as a result
of the breach.  Hussong v. Schwan’s Sales Enters., Inc., 896
S.W.2d 320, 326 (Tex. App.—Houston [1st Dist.] 1995, no pet.).  Whether a party’s conduct constitutes a
breach of contract is a question of law, reviewed de novo.  See E.P.
Towne Center Partners, L.P. v. Chopsticks, Inc., 242 S.W.3d 117, 123 (Tex. App.—El
Paso 2007, no pet.).  

Here, Dolphin
Street pled that Silver Lion breached the Management Agreement by (1)
“mandating that rent . . . for April 1, 2003 through June 30, 2003 be paid by
Larsen or Speer prior to purchase of Dolphin Street, Inc.”; (2) failing to file
and pay all mixed beverage and sales taxes from April 1, 2003 to June 30, 2003;
(3) closing Dolphin Street’s operations prior to June 30, 2003; (4) failing to
pay operating expenses from April 1, 2003 to June 30, 2003; (5) cancelling
Dolphin Street’s insurance in April 2003; and (6) removing assets of Dolphin
Street from the leased premises and failing to return them.   

          Silver
Lion argues that the evidence does not support the trial court’s findings that
it breached the Management Agreement.  For
example, Silver Lion argues that the trial court’s award of only nominal damages
defeats its finding that Silver Lion materially breached the Management
Agreement.  Further, Silver Lion refutes
Dolphin Street’s claim that it breached the Management Agreement by demanding
Larsen or Dolphin Street pay past due rents, arguing that Butcher made those
demands in good faith.  Finally, Silver
Lion points out that the evidence admitted at trial regarding the unpaid mixed
beverage and sales taxes or operating expenses from April 1, 2003 to June 30,
2003 did not show that Silver Lion had actually received any notice that these
sums were due and owing and that the evidence does not support any other
damages suffered by Larsen or Dolphin Street. 


C.  
Nominal Damages

 

Silver Lion first
argues that the trial court’s finding that it “materially” breached the
Management Agreement is legally inconsistent with the trial court’s award of
only “nominal” damages to Dolphin Street and Larsen.[4]  However, a trial court’s award of nominal
damages for a breach of contract is not necessarily a comment on the
materiality of the breach.  Instead, the
award of nominal damages relates to the proof admitted at trial of the type of
loss sustained by the plaintiff: 

The law is that, if the contract is proved to be
broken, the law would give some damage, sufficient to authorize a verdict for
the plaintiff, although in the absence of proof of special loss, the damages
would be nominal only.

 

MBM Financial Corp., 292 S.W.3d at 664.  Thus, we
decline to hold that an award of nominal damages must logically defeat a
finding of breach of contract.  Instead,
we examine each alleged breach in turn.  

D.  
Alleged Breaches 

 

1.                
Did Silver Lion breach the Management Agreement
by “mandating that rent . . . for April 1, 2003 through June 30, 2003 be paid
by Larsen or Speer prior to purchase of Dolphin Street, Inc.”?

 

We have already
determined that Silver Lion’s demands of payment of the allegedly past due
rents for April, May and June 2003 upon the completion of the sale of the
business to Speer were neither made in good faith nor reasonable under the
terms of the agreement between Silver Lion, Larsen and Dolphin Street.  An action that is not grounded in good faith,
however, is not necessarily a breach of a contract.  “The general rule is that, absent a special
relationship, there is no duty between parties to a contract to act in good
faith.”  El Paso Natural Gas Co. v. Minco Oil & Gas, Inc., 8 S.W.3d 309,
313 (Tex. 1999).  

In this case,
however, Silver Lion did more than demand rents to which it was not
entitled.  The Management Agreement
affirmatively required Silver Lion to forgive, or pay as an operating expense,
the rents for April, May, and June of 2003. 
There is no evidence that Silver Lion complied with this obligation.  On the other hand, there is no evidence in
the record to support a finding that Larsen or Dolphin Street suffered any
pecuniary damages under the contract for Silver Lion’s demand for rent to which
it was not entitled.  Neither Larsen nor
Speer ever paid the rents for the month at issue, nor did Silver Lion attempt
to evict Dolphin Street for the nonpayment of rent for these months.  

“A breach of
contract claim cannot survive if the plaintiff was not damaged by the breach.”  Eckland
Consultants, Inc. v. Ryder, Stilwell, Inc., 176 S.W.3d 80, 89 (Tex.
App.—Houston [1st Dist.] 2004, no pet.); see
also Pagosa Oil and Gas, L.L.C. v.
Marrs and Smith P’ship, No. 08-07-00090-CV, 2010 WL 450910 (Tex. App.—El
Paso, Feb. 10, 2010, pet. filed) (summary judgment on liability for breach of
contract improper where there was no evidence of injury caused by the breach).  “The burden is on the plaintiff to produce
evidence from which the [fact finder] may reasonably infer that the damages
claimed resulted from the defendant’s conduct.” 
Bernstein v. Thomas, 298
S.W.3d 817, 825 (Tex. App.—Dallas 2009, no pet.) (citing Texarkana Mem’l Hosp., Inc. v. Murdock, 946 S.W.2d 836, 838 (Tex. 1997)).
 “A plaintiff satisfies this requirement
when it presents the [fact finder] with proof that establishes a direct causal
connection between the damages awarded, the defendant’s actions, and the injury
suffered.”  Id.

Not even nominal
damages may be awarded for a failure to comply with a contractual obligation if
the damages are economic but not sufficiently proved.  MBM
Financial Corp., 292 S.W.3d at 664 (“[I]n recent decades the rule in Texas
has been that nominal damages are not available when the harm is entirely
economic and subject to proof (as opposed to non-economic harm to civil or
property rights)).”  Thus, under these
facts, there is no evidence to support the trial court’s finding that the
demand for rent to which Silver Lion was not entitled constituted a breach of
the Management Agreement that caused damages to Larsen or Dolphin Street.

2.    
Did Silver Lion breach the Management Agreement
by failing to pay taxes and operating expenses during the period of the Management
Agreement?

 

The Management
Agreement called for Silver Lion to pay certain invoices and operating expenses
of the nightclub, and to file and pay the necessary taxes on the club.  Larsen admitted that Silver Lion and Butcher
paid some of the invoices due to alcohol suppliers, but contended that Silver
Lion failed to pay employees’ wages and other obligations.  At trial, Larsen testified that, in the
summer of 2003, he paid for taxes, utilities, employee wages, supplies and
other items for the club that were Silver Lion’s responsibility under the
Management Agreement.  He admitted
documents substantiating his claims that he, not Butcher or Silver Lion, had
paid these claims. 

However, none of
the documents Larsen relied upon to substantiate his damages testimony showed
that Butcher and Silver Lion actually received and failed to pay any of the
invoices upon which Larsen and Dolphin Street based their claim for breach of
the Management Agreement.  Instead, with
the exception of one document, all of these invoices and statements appeared to
have been sent to Larsen or his girlfriend at their home addresses.  For his part, Butcher testified that he never
received notices from the TABC or other taxing entities.  The sole exhibit that appears to have been
sent to the club, and thus presumably received by Butcher, is an invoice for
liquor that is signed by Butcher’s wife and marked “paid.”  

In construing a
written contract, our primary concern is to ascertain and give effect to the
intentions the parties have objectively manifested in that instrument.  Frost
Nat’l Bank v. L & F Distribs.,
Ltd., 165 S.W.3d 310, 311–12 (Tex. 2005) (per curiam); see Fiess v. State Farm Lloyds, 202 S.W.3d 744, 746 (Tex. 2006) (“[T]he
parties’ intent is governed by what they said, not by what they intended to say
but did not.”).  In determining the
meaning of contract terms, we may also consider the context of the
circumstances existing at the time the contract was executed and the particular
business activity sought to be served.  See Columbia Gas Transmission Corp. v. New
Ulm Gas, Ltd., 940 S.W.2d 587, 589 (Tex. 1996); Reilly v. Rangers Mgmt., Inc., 727 S.W.2d 527, 530 (Tex. 1987).  If we can give the contract a definite or
certain legal meaning, it is unambiguous and we construe it as a matter of law.
 Willis
v. Donnelly, 199 S.W.3d 262, 275 (Tex. 2006); J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003). 

In this case, the
evidence at trial was that Butcher and Larsen negotiated the Management
Agreement because Larsen was no longer able to operate the nightclub and
instead desired to return for a time to Alaska, where he was employed.  The Management Agreement noted that the list
of accounts payable attached was incomplete and it called for the list to be
updated, presumably by Larsen, who was the custodian of such information.  In keeping with this provision, and in light
of the circumstances under which the Management Agreement was negotiated and its
stated purpose, we construe the Management Agreement as placing an obligation
upon Larsen and Dolphin Street to update the mailing addresses to which the
invoices and tax statements were sent, or to inform Silver Lion and Butcher
that the invoices and statements would not be sent to the nightclub.  There is no evidence that this was done.  Similarly, we decline to construe the
Management Agreement as obliging Silver Lion to pay invoices and taxes for
which there is no evidence that it received statements or documentation.  

Larsen and
Dolphin Street failed to provide any evidence that Silver Lion received but
neglected to pay any invoices or obligations, or that Silver Lion was provided
the proper information with which to file taxes for the nightclub but failed to
do so.  Accordingly, there is no evidence
to support a finding that Silver Lion breached the Management Agreement by
failing to file and pay the taxes and pay the operating expenses that Larsen
testified he paid in the summer and fall of 2003. 

3.    
Did Silver Lion breach the Management Agreement
by closing Dolphin Street’s operations prior to June 30, 2003 or by removing
assets of Dolphin Street from the leased premises and failing to return them?

 

There was no
evidence regarding any specific damages that Larsen or Dolphin Street sustained
as a result of the nightclub ceasing to operate prior to June 30, 2003.  Similarly, there was no evidence regarding
any damages sustained as a result of Silver Lion’s alleged removal of Dolphin
Street’s assets from the premises.  Accordingly,
there is no evidence to support a finding that Silver Lion breached the
Management Agreement on these grounds.  See, e.g., Eckland Consultants, 176
S.W.3d at 89.

4.    
Did Silver Lion breach the Management Agreement
by cancelling Dolphin Street’s insurance in April 2003?

 

Finally, Dolphin
Street and Larsen allege that Silver Lion breached the Management Agreement by
failing to maintain insurance on the nightclub. 
The record reveals that Larsen’s claim that Silver Lion failed to
maintain insurance on the nightclub—despite its promise to “renew or keep
current all insurance currently carried by Dolphin Street . . . or needed to
secure the assets of Dolphin Street”—went unrefuted.  Although Butcher and Larsen each blamed the
other for the lapse in coverage, Butcher nonetheless admitted that the
insurance lapsed after the Management Agreement took effect, and he did not
testify that either he or Silver Lion made any effort to maintain or renew the
insurance as required by the Management Agreement.  Thus, Silver Lion failed to comply with this
obligation under the Management Agreement. 
Larsen did not testify however, that the lapse in insurance actually
caused him or Dolphin Street any damages. 
While we agree that it was Silver Lion’s contractual obligation to
maintain insurance on the nightclub, we decline to speculate as to any damages or
injury Dolphin Street or Larsen may have sustained as a result of Silver Lion’s
failure to do so.  See, e.g., Eckland Consultants, 176 S.W.3d at 89.

None of the
breaches alleged by Dolphin Street and Larsen, when examined in the light of
the record and the Management Agreement itself, support the trial court’s
conclusion that Silver Lion breached the Management Agreement.  Accordingly, we hold that the trial court
erred by concluding that Silver Lion breached the Management Agreement.  We sustain Silver Lion’s second issue.   

III.       
Trial Court’s
Finding Dolphin Street and Larsen did not Breach Lease or Guaranty

 

In its third
issue, Silver Lion contends that the evidence shows that Dolphin Street and
Larsen breached the Management Agreement, the Lease and Larsen’s Guaranty by
not paying the rents due in April, May and June 2003 in the amount of
$19,288.26 and thus, despite the trial court’s ruling that Silver Lion breached
the Management Agreement, it should have awarded this sum in damages to Silver
Lion.  We find this argument
unpersuasive.  The construction of an
unambiguous contract is a question of law for the reviewing court to consider
de novo.  MCI Tel. Corp. v. Texas
Utilis., 995 S.W.2d 647, 650–51 (Tex. 1999).  Under Texas law, instruments pertaining to
the same transaction may be read together, even if the parties execute the
instruments at different times and the instruments do not expressly refer to
each other.  See Fort Worth Indep. Sch.
Dist. v. City of Fort Worth, 22
S.W.3d 831, 840 (Tex. 2000).  In
appropriate instances, a court may construe all the transactional documents as
if they were part of a single, unified instrument.  Id. 

          Under
the facts of this case, the Management Agreement, Lease and Guaranty all
pertain to the same transaction, and, accordingly, we construe them together as
one instrument.  Both the Guaranty and
the Lease are attached to the Management Agreement.  The Management Agreement refers to the Lease
Agreement and specifically addresses Dolphin Street’s obligation regarding the
rents due in April, May, and June of 2003 under the Lease.[5]  In turn, the Guaranty refers to the Lease and
is a promise by Larsen to pay any and all of Dolphin Street’s obligations under
the Lease.[6]

          As
we held above, under the clear and unequivocal language of Paragraphs 5 and 14
of the Management Agreement, Dolphin Street had no obligation under the Lease
to pay Silver Lion the amount of $19,288.26 for the rents due in April, May,
and June of 2003.  These rents were to be
either forgiven outright or used in calculating Silver Lion’s profits and
losses for its operation of the nightclub during the 90-day period.  Since Dolphin Street had no obligation to pay
Silver Lion these rents under the Lease, Larsen cannot have any obligation to
pay Silver Lion for these rents under the Guaranty.  Accordingly, we hold that the trial court did
not err in concluding that Silver Lion was not entitled to recover for breach
of the Management Agreement, the Lease or the Guaranty.[7]  

          In
a sub-argument, Silver Lion contends that, even if under the Management
Agreement and Lease Dolphin Street does not owe the rent for April, May, and
June of 2003, the Guaranty still obligates Larsen to pay these sums to Silver
Lion.  Silver Lion cites the following
language from the Guaranty in support of this argument: 

Guarantor [Larsen] guarantees the performance of the
Tenant’s obligations under the Lease. . . .

 

This is a primary, irrevocable, and unconditional
guaranty of payment and performance of and not of collection and is independent
of Tenant’ obligations under the Lease. . . .

 

This guaranty will remain in effect regardless of any
modifications or extension of the Lease. . . . 

 

[Larsen’s] obligations will not be diminished by any
compromise or release agreed on by Tenant and Landlord.  

 

However, for purposes of determining
the payment of rents, this language cannot be read in isolation from the Lease
because, as the plain language of the Guaranty states, it is a guarantee of
“the performance of the Tenant’s obligations under the Lease.”  It is axiomatic that if the tenant has no
obligation to pay rents under the Lease, the guarantor has no obligation to pay
the rents either.  

          Finally,
Silver Lion contends that, at the very least, it is entitled to recover sums
for “prior obligations” it paid on behalf of Dolphin Street while it operated
the club under the Management Agreement. 
However, the record reveals that Silver Lion failed to present adequate
evidence of which payments it made and which payments it was owed under the
Management Agreement.  Further, such
reimbursement was to be made from the proceeds of the sale of the nightclub—a
sale that was never completed.  Accordingly,
the trial court could have reasonably concluded that Silver Lion failed to meet
its burden of establishing its right to such payments and that Dolphin Street
or Larsen had breached their contracts with Silver Lion.  We therefore overrule Silver Lion’s third
issue challenging the trial court’s finding that Dolphin Street and Larsen did
not breach the contracts at issue. 

IV.          
Attorney’s Fees 

          Finally,
in its fourth issue, Silver Lion challenges the trial court’s award of attorney’s
fees to Dolphin Street and Larsen on the grounds that the trial court awarded
only nominal damages for their breach of contract claims, and they raised no
other grounds to support an award of attorney’s fees.  Dolphin Street and Larsen counter by arguing
that the Guaranty signed by Larsen had a provision awarding the “prevailing
party” its fees, Silver Lion based its lawsuit against Larsen on this Guaranty,
and Larsen was awarded judgment in his favor on Silver Lion’s claims against
him. 

          Under
Texas statutory law, a party may recover reasonable attorney’s fees from an
individual or corporation, in addition to the amount of a valid claim and
costs, if the claim is for breach of an oral or written contract.  See
Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (Vernon 2008).       Parties
to a contract may also recover attorney’s fees, however, if they arrange for
such recovery as a contractual term.  Alma
Group, L.L.C. v. Palmer, 143 S.W.3d 840, 845 (Tex. App.—Corpus Christi
2004, pet. denied) (citing New Amsterdam Cas. v. Tex. Indus., Inc., 414
S.W.2d 914, 915 (Tex. 1967)).  “Parties
are free to contract for a fee-recovery standard either looser or stricter than
Chapter 38’s . . .”  Intercontiental Group P’ship v. KB Home Lone Star L.P., 295 S.W.3d
650, 653 (Tex. 2009).  In such cases, it
is the language of the contract, not the statute, which governs.  Id.
(reviewing definition of “prevailing party” under contract to determine whether
plaintiff who had not recovered any actual damages was entitled to recover
attorney’s fees); Twelve Oaks Tower I, Ltd. v. Premier Allergy, Inc.,
938 S.W.2d 102, 118 (Tex. App.—Houston [14th Dist.] 1996, no writ).  As Dolphin Street and Larsen correctly point
out, Silver Lion sued Larsen for breach of the Guaranty, which states that
“[t]he prevailing party in any dispute arising out of this guaranty will be
entitled to recover reasonable attorney’s fees.”  Where a contract does not define “prevailing
party,” we are to “presume the parties intended the terms ordinary
meaning.”  Intercontinental, 295 S.W.3d at 653.  

          In
Intercontinental, the Texas Supreme
Court analyzed the issue of whether a plaintiff who does not recover damages on
its breach of contract claim can still be the “prevailing party” to recover
attorney’s fees under a contract.  Id. 
The court in Intercontinental
did not reach the issue of whether the defendant in that case could instead be
the “prevailing party,” holding that the defendant had waived that issue for
appeal.  Id. at 657.  Accordingly, we
look to other authority to decide whether Larsen, as a defendant who was
awarded a take-nothing judgment on a claim of breach of contract against him,
can be the “prevailing party” under the Guaranty Agreement.  

A prevailing
party is the party “who successfully prosecutes the action or successfully
defends against it, prevailing on the main issue, even though not to the extent
of its original contention.”  Johns v.
Ram-Forwarding, Inc., 29 S.W.3d 635, 637–38 (Tex. App.—Houston [1st Dist.]
2000, no pet.) (citing City of Amarillo v. Glick, 991 S.W.2d 14, 17
(Tex. App.—Amarillo 1997, pet. denied)). 
To be a “prevailing party,” a party must be successful on the merits of
the claim even if the party is not awarded damages.  Robbins
v. Capozzi, 100 S.W.3d 18, 27 (Tex. App.—Tyler 2003, no pet.).  A prevailing party is vindicated by the court’s
judgment.  Id. (in suit brought by buyer of real estate against seller of real
estate under contract provision awarding fees to prevailing party, defendant
was entitled to attorney’s fees for successfully defending claims).  

          Larsen
prevailed in the trial court when the court entered a take-nothing judgment in
his favor on Silver Lion’s claim against him for breach of the Guaranty, and he
is therefore entitled to his attorney’s fees under the Guaranty’s terms for his
defense of the claims related to the Guaranty. 
Because Dolphin Street was not a signatory to the Guaranty, however, we
find no basis for awarding it attorney’s fees.  We therefore sustain Silver Lion’s fourth
issue, in part, and reverse the trial court’s award of fees to Dolphin Street.

V.      Dolphin Street
and Larsen’s Cross-Point

          By
way of a cross-point, Dolphin Street and Larsen complain that the trial court
erred by awarding only nominal damages of $100, in spite of its finding that
Silver Lion materially breached the Management Agreement.  Accordingly, they ask us to reverse that
portion of the judgment and render judgment in their favor in the amount of
$32,368.91 on their breach of contract claim against Silver Lion.  

          In
light of our holding above that there was no evidence to support a finding that
Dolphin Street or Larsen sustained any damages as a result of any of Silver
Lion’s alleged failures to comply with the Management Agreement, neither
Dolphin Street nor Larsen is entitled to any damages on their breach of
contract claim.  Accordingly, we overrule
Dolphin Street and Larsen’s cross-point and reverse the trial court’s award of
damages for breach of the Management Agreement.

 

 

CONCLUSION

          We
affirm the trial court’s judgment in part, holding that the evidence is legally
and factually sufficient to support the trial court’s findings that (1) Silver
Lion tortiously interfered with the sale of Dolphin Street and (2) Dolphin
Street and Larsen did not breach the Lease and Guaranty at issue.  

We sustain Silver Lion’s fourth issue
in part, holding that the trial court properly awarded attorney’s fees to
Larsen as a signatory to the Guaranty but erred in awarding attorney’s fees to
Dolphin Street because it was not a signatory to that Guaranty.  Accordingly, we reverse that part of the trial
court’s judgment awarding attorney’s fees to Dolphin Street.  

We also sustain Silver Lion’s second
issue and reverse the trial court’s finding that Silver Lion breached the
Management Agreement.  We render judgment
for Silver Lion on Dolphin Street and Larsen’s breach of contract claims based
upon the Management Agreement and vacate the trial court’s award of $100 to
Dolphin Street and Larsen.  

 

 

 

                                                          George
C. Hanks, Jr.

                                                          Justice

 

Panel consists of Justices
Jennings, Hanks, and Bland.











[1]
          Silver Lion has not presented,
nor have we found, any case law holding that a party cannot prove a claim for
tortious interference unless it has specifically pled each of the elements of
the underlying independent tort or unlawful act.  Nor do we believe that Sturges imposes
such a requirement where, as here, Silver Lion did not specially except to
Dolphin Street’s tortious interference pleadings.  





[2]               At
oral argument, Silver Lion contended that paragraph 2 of Agreement also
supports its argument that Speer was required to pay these rents upon
purchasing the nightclub.  This paragraph
provides in pertinent part that:

 

2.     . . .  However, this agreement does not transfer,
relieve or indemnify Dolphin Street, Inc. from any and all liabilities,
regarding the supporting lease.

 

            This
paragraph, however, cannot be read in isolation from the clear language of the
rest of the Management Agreement.  See
Phillips Petroleum Co. v. St. Paul Fire & Marine Ins. Co., 113 S.W.3d
37, 40 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).  When read with the entire Agreement, this
paragraph merely provides that Dolphin Street continued to incur obligations
under the lease after March 31, 2003.  In
paragraph 5, the parties specifically agreed how they would treat rent coming
due during the time Silver Lion operated the club—i.e., it was to be forgiven outright or paid by Silver Lion as
an operating expense.  





[3]
          We agree with Silver Lion that,
under the holding in Fina  Supply,
Inc. v. Abilene Nat’l Bank, 726 S.W.2d 537, 540 (Tex. 1987), Dolphin
Street has no basis for a claim that Dolphin Street itself was defrauded by
Silver Lion in this action.  However,
such a claim is not necessary for Dolphin Street to establish a claim for
tortious interference.  As the Texas
Supreme Court held in Sturges, a plaintiff may also recover for tortious
interference from a defendant who makes fraudulent statements about the
plaintiff to a third person without proving that the third person was
actually defrauded.  Sturges, 52 S.W.3d at 713.





[4]
          As the Texas Supreme Court
recently noted, “[T]he usual meaning of the phrase ‘nominal damages’ refers to
an award of one dollar.”  MBM Fin. Corp. v. Woodlands Operating Co.,
L.P., 292 S.W.3d 660, 665 (Tex. 2009) (holding that award of $1,000 is not
an award of “nominal” damages).  None of
the parties in this case, however, challenge the trial court’s characterization
of its award to Dolphin Street and Larsen $100 as “nominal damages” and we
therefore accept this characterization for purposes of this appeal.  Id.
(noting that some courts have awarded $100 as “nominal damages,” although
“nominal damages are supposed to be a ‘trifling sum’”). 





[5]
              The
Management Agreement provides in pertinent part, “Landlord will forgive or pay
as an operating expense all rents due Silver Lion, Inc. during the period of
this agreement.”

 





[6]
              The
Guaranty provides in pertinent part that “Guarantor [Larsen] guarantees
the  performance of the Tenant’s
obligations under the Lease.”

 





[7]
              Silver
Lion argues that the trial court’s conclusion that Silver Lion’s breach of the
Management Agreement relieved Dolphin Street and Larsen of performance under
the Guaranty and Lease cannot stand because neither pled the affirmative
defense of excuse.  However, under the
facts of this case, neither this conclusion nor an affirmative pleading of
excuse is required to uphold the trial court’s take-nothing judgment on Silver
Lion’s claims.